## WEST et al. v. HATCH et al.

District Court, S. D. New York.
Feb. 9, 1943.

Kelley & Connelly, of New York City (John E. Connelly, Jr., of New York City, of counsel), for defendant Hatch.

Charles D. Prutzman, of New York City (J. Alvin Van Bergh, of New York City, of counsel), for defendant Universal Pictures Co.

Joseph Schultz, and Henry E. Schultz, both of New York City, for MacFadden Publications, Inc.

James C. Cleary, of New York City, for defendant Grosset & Dunlap, Inc.,

KNOX, District Judge.

Dorothy West, in collaboration with Madge Christie, wrote a play called "This Modern Instance." It was copyrighted August 16, 1933. At that time, Miss Christie was manager of a summer theatre, located in Delaware, not far from Wilmington. The play was produced there, and ran for several performances.

Miss West is an actress and has had considerable experience upon the stage, and as a radio performer. For some time she was connected with the National Broadcasting System.

Defendant Hatch is a writer, and is the author of a number of books, short stories, and possibly, has done scenarios. Like many authors he sold his literary products through the medium of an agent. Mrs. Hatch, from time to time, was employed in doing secretarial work for a literary agent named Watkins. As a result, she was acquainted generally with authors' scripts, and in some cases, had handled them.

In the Fall of 1934, Miss West submitted the manuscript of her play to a man named Rainey, then a production manager for National Broadcasting Company. At this time, Mrs. Hatch was working as secretary for a Mr. Lundell, an announcer for the broadcasting company. Lundell's office and that of Rainey were upon the same floor. Between the occupants of the two offices there seems to have been more or less frequent association. Defendant Hatch, during the period his wife was working for Lundell, would sometimes call for her at the office of her employer. Now and then he would wait for her to finish some task on which she happened to be engaged.

While Miss West's play was in Rainey's hands, Hatch, acting through an agent, submitted a story entitled "Irene, the Stubborn Girl," or "My Man, Godfrey," to Liberty Magazine for approval. This publication was afterwards taken over by MacFadden Publications, Inc., one of the defendants. The story, having been accepted by the magazine, the complete manuscript was delivered to its publisher in January 1935.

Thereafter, Hatch's story, under the name of "My Man, Godfrey," was published in book form by Grosset & Dunlap, Inc., and the moving picture rights were sold to Universal Pictures Co., Inc. That concern produced a picture that appealed to the public, and it was shown in motion picture houses all over the land, as well as elsewhere.

Plaintiff, alleging that Hatch's story was pirated from Miss West's story, seeks remedial relief from the wrongs charged against each of the defendants.

As bearing upon the question of Hatch's access to the play of Miss West, it is to be noted that Miss Christie testified that he, together with two or three other men, saw the play when it was in production in Delaware. Hatch, corroborated by his wife, vigorously denies that he ever saw either the manuscript of "This Modern Instance," or its presentation upon the stage. Upon the night when Hatch is said to have seen the stage production of Miss West's comedy, both he and his wife declare that he was at his mother's home on Long Island, in attendance upon a party given in honor of her birthday. So far as the opportunity of reading the manuscript while it was in possession of Rainey is concerned, both Mr. and Mrs. Hatch deny that they saw the same, and disclaim all knowledge of its existence. The testimony upon this phase of the case, standing alone, fails to satisfy me that Hatch saw either Miss West's manuscript or the production of her play. This conclusion might well be sufficient to resolve the present controversy, but I shall not content myself with so doing. Even though I be in error in finding Hatch's absence of access to "This Modern Instance," I am of opinion that the differences between Miss West's composition, and that of Hatch, are so radical and extreme as to refute the charge that defendants are plagiarists. In

order for this to appear clearly, a brief comparison of the two works may not be amiss.

Miss West's play, as well as Hatch's story, had their genesis in the years of the financial depression that settled upon America in the memorable years of 1933 and 1934. Men, formerly prosperous, were out of work and struggling for existence. Persons, who once were in comfortable circumstances and walked pridefully, were reduced to want and penury. Many of them, seeking food and shelter wherever they might be found, were hard pressed to find either. In New York City, shanty-towns developed along the rivers, and in the parks. Here in makeshift shelters, by one means or another, men eked out existence, and found a measure of protection from rain, storms and wintry blasts. Meanwhile, persons more fortunately situated, pursued their accustomed ways, lived in luxurious idleness, and toyed with relief. Such is the background of both Miss West's play and Hatch's story.

Miss West's comedy, in outline, is this—Genevive Winters, a superficial and flighty woman, was the wife of a well-to-do lawyer, whose given name was Henry. While, at times, protesting her extravagances and foolishness, he indulged her whims and vagaries. One of these was that she, and others of her social stratum, should adopt families that were themselves unable to cope with the economic situation of the times. Mrs. Winters, in fact, was the Vice President of an organization to serve such purposes. Impulsively, she had herself "adopted" two families. When this occurred, her husband was absent from home. In her wish to alleviate existing conditions, Mrs. Winters had the assistance and acquiescence of Flossie Evans, a bosom female companion. But, in line with the family adoption idea, Mrs. Winters had come upon a handsome young man named Williams. Later, he turned out to have graduated at Harvard. He spoke excellent English, and was possessed of the demeanor of a gentleman. At the moment, however, due to an estrangement with his family, he was desperately in need of a means of a livelihood. Mrs. Winters installed him in her house as a butler. When he accepted this employment, he professed experience in the work, but gave no references as to his abilities. Neither did he completely reveal his identity. Upon the whole, therefore, he was a man of mystery. He performed his work satisfactorily, discharging his duties in a manner of amused detachment. Being an attractive individual, the maids in Mrs. Winters' home found him the cause of dissension and discord. One was in love with him, another one was his enemy. This created more or less unpleasantness in the household and it was at its height when Mr. Winters returned home. But, before this occurred, Mrs. Winters had received a call from a man named Mirsky and, upon the pretense that he was a furrier in financial distress, he persuaded her to buy a coat that turned out to have been stolen. Mrs. Winters, being without sufficient ready cash to pay the price of the coat, gave Mirsky a check upon a bank that had closed its doors at the beginning of the bank holiday of 1933. The bank, thereafter, failed to reopen. Later on, Mirsky being unable to cash the check, again called upon Mrs. Winters, and asked for cash. Not receiving it, he became threatening, and getting his hands upon a pearl necklace of Mrs. Winters, which he pocketed, he pulled a gun to terrorize her. Thereupon, Williams struck Mirsky and floored him. Subsequently, he was handed over to a detective.

Meanwhile, a friend of Williams, named Stuart, also financially embarrassed, called to see him. Being unable to support his wife, the two had separated, and Stuart had given expression to statements that indicated he might take his life. His wife, Ann, who was employed in a dress shop, was with child, and ill. Mrs. Winters had visited the shop with the members of her "adopted" families and come to know Ann. Following this episode, Mrs. Stuart put in an appearance at the Winters' home and was reunited with her husband. It then appeared that Stuart and Williams were classmates at Harvard. Mr. Winters, upon learning these facts, was sympathetic with Stuart and Ann, and sent them to take charge of his house in Connecticut. Williams, upon the revelation of his identity, resigns his place, and having refused a reward for his part in bringing Mirsky to justice, passes from the scene.

In reality, Williams is little more than a foil for the comedy provided by the other characters in the play. Aside from his previous social position, his part in the plot is hardly more than that played by the butler in any household, able to afford one. In other words, with the exceptions noted,

he is a conventional character. As will be seen from what is about to be said, he differs substantially from the butler in "My Man, Godfrey."

As delineated by Hatch, Godfrey is a good looking man—well educated, daring and resourceful.

Being without funds, he came to find himself in the hut of a ne'er-do-well, located somewhere along the East River. It is there he was discovered by Irene Bullock. Irene, herself, was a young woman of society. Although not overly bright, she had a bit of understanding, and some consideration for other persons. Cornelia, her younger sister, was an arrogant, selfish society snob. Angelica Bullock was the mother of both Irene and Cornelia. She was a pampered, extravagant, foolish woman, engaged constantly in seeking to amuse herself, even to the point of silliness. Alexander, her banker husband, was much worried about business affairs, and left his wife and children largely to their own devices.. As regards them, his chief function was to finance their foolishness.

Molly, a maid servant, together with a cook, made up the Bullock household.

The action in the Hatch story starts when "Oscar" of the Waldorf stood watching Mrs. Bullock in her endeavor to persuade a goat to go through the doorway of the Jade Room, in order that it might be her contribution to what was known as a "scavenger hunt." Irene Bullock, taking note of her mother's difficulties, gave the goat a kick, whereupon both it and her mother were catapulted into the room. Cornelia noted the contributions to the hunt that were made by other guests. Among them were an old bicycle, chorus girl paraphernalia and the like—and she conceived the idea that if she were to produce a "forgotten man," she might possibly win the prize to be given for the most unique offering to the party's gaiety. Thereupon, Cornelia, together with George, her boy friend, and Irene, went in an automobile to one of the packing case camps of the down and out. Upon arrival there, Cornelia walked into one of the shacks, and there found a forlorn looking and bearded man who, with difficulty, was seeking to get warmth from a reluctantly burning fire. Being surprised at the sight of his visitor, the man bade her be gone. Cornelia, declining to depart, offered the man a five dollar bill if he would go with her to the hotel, and act the part of a man who was a forgotten, washed-up, dead-beat. Upon giving expression to this thought, Cornelia shortly found herself tossed out of the hut into the debris of the immediate area. Regaining her feet, and regretting her effrontery, she and George entered their car and drove away. Irene lingered at the camp and, in short order, she and the "forgotten man" found themselves upon a pleasant basis of understanding. Even so, Irene did not notice the Oxford accent of the man's speech. She proceeded to explain the "man hunt" expedition, and her desire to win the prize. Her method of approach to the "forgotten man" differed materially from that of Cornelia, and he finally agreed to go to the Waldorf. Following his presentation to the town's nabobs, a prize, consisting of a silver cup was awarded to Irene, and the man started to leave the room, and to return to his cheerless hut. Thereupon, Irene offered to help him by giving him a job as butler at her parents' home. Cornelia was willing that this should come about so that she would be afforded an opportunity to take revenge upon him for her humiliation of the earlier part of the day. She thereupon prevailed upon her mother to ratify Irene's offer to the "forgotten man." Matters being thus arranged, Irene gave the man some money and told him to report for duty the following day.

Upon the morrow "Godfrey" appeared at the Bullock household and entered upon his work. Shortly following his arrival, he went to Mrs. Bullock's bedroom to close the window. Upon seeing him, the woman was both delighted and amazed. Godfrey, over night, had been transformed. Clean-shaven, erect, courteous, suave and well dressed, he acted the part of a perfect butler. Upon inquiry, Mrs. Bullock learned that Godfrey had last worked for Mrs. H. G. Clarke, in Boston.

Having acquitted himself creditably with the lady of the house, he next undertook to render a similar service to Cornelia. This young lady never wished her breakfast until she was ready for it. Of this the maid had given due warning to Godfrey. But he, being a man of initiative and daring, went about "getting her out of the hay." Upon entering the room, Cornelia, who was suffering ill effects from her indulgences of the previous night, upraided the butler and threatened him with retaliation for the events of the day before. Becoming sick at the sight of her breakfast tray, her distress, through the medium of an alcoholic beverage, was relieved by Godfrey. Not-

withstanding, Cornelia remained unpacified with the servant, who then left the room.

Irene, always happy in the morning, next received attention from Godfrey. So pleased was she with his service and appearance that she insisted that he sit at the foot of the bed while she ate her morning repast. Mildly protesting the impropriety of Irene's invitation, Godfrey did as requested. A few minutes later, when Molly the maid enters the door, she found Godfrey and Irene holding each other's hand. Surprised at the sight, Molly screamed and ran away. Godfrey, feeling that this episode meant the loss of his job, was reassured by Irene. The secret was held inviolate, and Godfrey remained at work. The maid confided to him her relief that he was not a real butler and that she understood the situation, if it were that he and Irene must, in order to be together, put on this pretense.

With the exception of a few unpleasantries with Cornelia, matters in the Bullock household, for all concerned, proceeded comfortably for the next two weeks. Mrs. Bullock, it appears, had a protegee, Carlo by name, who was a musician, and something of a freak. One day Godfrey finds him kissing Mrs. Bullock, and this upset the butler. A morning or two thereafter, when Mr. Bullock is eating breakfast and looking at the morning paper, he sees a news article that suggests that something is scandalously wrong in the Bullock bank, and that he is responsible. Godfrey, seeing the cause of Bullock's agitation, declared his loyalty, and expressed a desire to continue in his work.

The following Saturday night, Irene returned home and acted as though she were intoxicated. Godfrey, believing this to be the fact, and thinking that a cold shower will be of benefit to her, endeavored to put her into a bathtub in order to administer cold water aid. Irene, yelling in protest, admitted that she was attempting to deceive Godfrey, and that what she really wanted was for him to carry her. Glances of affection passed between the two and these culminated in a kiss that Godfrey bestowed upon Irene.

A morning or two thereafter, Mrs. Bullock discovered that a set of beautiful pearls are missing. Going into a tantrum, she summoned both Godfrey and the maid. Mrs. Bullock could not be comforted until Godfrey reminded her that the jewels were insured. That information was sufficient for the pacification of her nerves. Godfrey took note of the fact that a pane in the window which, at night, always stood open, was broken. This, to him, seemed odd. His perplexity—and suspicion—were increased when, calling Mr. Bullock on the telephone to inform him of the loss, the latter's reply was something other than might naturally have been expected.

When the representative of the Insurance Company reached the Bullock household, he suspected Godfrey of stealing the jewels, and asked him if he had a prison record. Godfrey admitted that such was the fact. A detective, who was also present, overheard Irene say that she did not care if the butler had taken the jewels because of the small pay he received as a butler. The detective, assigning Godfrey's need of money as a motive for the theft, arrested the butler. However, after Godfrey and Irene had given the detective a number of drinks, he gave no further official attention to Godfrey. At this point, Molly, and the cook, began to philosophize upon the situation. The cook said she had never heard of a daughter of the house marrying a butler, and the maid, about whose waist, Godfrey has occasionally slipped his arm, remarked "He aint no butler, he's a gentleman." The cook replied "So you've got it too, have you?"

When Mr. Bullock returned home in the evening of the day of the "theft" Godfrey, who suspected that his employer's desperate financial situation had led him to take the pearls, told him so. Bullock, taken by surprise, asked the butler if he were a Department of Justice man. Upon replying in a negative answer, Godfrey added "No, I'm a forgotten man. In my own way I'm trying to keep you from becoming one too. * * *" Then, as Bullock confessed having taken the pearls, Godfrey told him to offer a large reward for their return. This, by attracting publicity, would serve to reestablish Bullock's credit. When this had been done, it was planned to have a friend "find" the necklace and in the presence of reporters and photographers, return it to Mrs. Bullock. The idea appealed to Bullock and he exclaimed "By God, you're right Godfrey, you find the pearls, and I'll give you a check for $10,000 which you can return to me and I'll give you another for a suitable sum."

The plan was put into execution the following day. Godfrey pretended to have found the necklace in an automobile of Mrs. Bullock. The "return" of the jewels was carried out with a fanfare of publicity as arranged. Godfrey publicly received the check for $10,000 but was embarrassed by all that took place. In order to compose his spirit, he asked to be excused from serving luncheon so that he might take a walk. Still having the check in his possession, Cornelia said that she believed Godfrey would not return to the house. At this Irene remarked "If you're bolting the course, I'll go with you if you like." This pleased Godfrey and he told her he was not going away. But, as he proceeded along his walk, his mind reverted to Irene, and he thought of her with affection. Bullock arrived home before Godfrey's return, and hearing Cornelia criticising her mother for not getting possession of the check, Bullock became worried upon this score. But, of course, Godfrey returned to the house and when he had done so, Bullock asked him for the return of the check. Upon being told that it had been placed where it would do Bullock the most good, the latter said "You're fired." Godfrey retorted "If I'm through being a butler, sir, why then you're through being a banker." A day or two thereafter, Bullock's bank went to the wall, and when Bullock came to his home, he was anticipating a long prison term, and was greatly dejected. Godfrey comforted him by saying that arrangements had been made for him to find a haven of refuge in the South Sea Islands. To this plan Bullock gave assent, and was accompanied to the boat, on which he was to make his journey, by Godfrey and Irene.

The Bullocks were then told of their butler's identity. He turned out to be Godfrey Parkes, of an old time Boston family. He confessed that, for assaulting a lover of his wife, he had served a prison term. That marriage had ended in divorce. Mrs. Bullock was impressed by all this and, to Irene, Godfrey was more attractive than ever before. It now came to light that, by using the $10,000 check in speculating in one of Bullock's stocks, Godfrey had become a rich man. He felt, nevertheless, that he could not use the money lest he be charged with having engaged in a conspiracy with Bullock. Godfrey informed his mistress that he was about to become headwaiter in an exclusive cafe, where Carlo would assist him. Mrs. Bullock, he suggested, could send patrons to the restaurant. He told Corneliz that she must marry her faithful George and she proceeded to do so.

From then on, things moved smoothly enough until Viola, Godfrey's divorced wife, called upon him at the cafe, and asked for money, but was refused. Irene then managed to let Viola know that Godfrey had money hidden away. Viola then insisted that he call upon her at her hotel. On his arrival there, she attempted to blackmail him. Irene ended the conference by sitting on the curb in front of the hotel, and making an ass of herself. Godfrey appeared upon the scene and tried to take Irene home. She, however, insisted upon going to Godfrey's apartment where she slept in his bed—he upon a couch. Upon learning of this, Mrs. Bullock was greatly distressed, and Irene allowed her mother to indulge her full imagination as to the seriousness of her conduct. After more or less by-play, Godfrey and Irene found they loved each other and were married. They, too, went to the South Seas where they found Bullock buying pearls from the natives. His intention was, when he has become sufficiently wealthy, to repay the creditors of his bank. In the meantime, he had acquired a number of wives, and Godfrey thought that he had inherited at least ten mothers-in-law. However, he felt that he could endure that number, and that Irene was worth all that might come to him from the wives of his father-in-law.

From the foregoing comparison of Miss West's play and Hatch's story, it will be seen that while there are resemblances in the two productions, the differences between them far outweigh the similarities.

The developments of the themes of the respective authors are along totally divergent lines. Winters is a respectable lawyer. He and his wife have no children. The Bullocks have two, and one of them, Irene, is the secondary character in Hatch's tale. In Miss West's comedy, the butler plays second fiddle to Mrs. Winters. His background is not unlike that of Godfrey, but the personalities of the two characters are as different as day and night. Each of them, basically, is a gentleman. One, nevertheless, in action, is quiet, respectful and conventional. The other is assertive, resourceful, audacious to the point of impudence, and entirely uncon-

ventional. Instead of being a wheel, as is Williams, on Miss West's literary wagon, Godfrey is the vehicle on which Hatch's story has ridden to popularity and substantial monetary returns. In other words, he is a novel character, and in no respect can he be considered a counterpart of the Williams of "This Modern Instance."

As between the negress and the Jewish woman who, in "This Modern Instance" furnish a quantum of merriment, and the natives who greeted Godfrey and Irene on their arrival at the South Seas Island, there is no resemblance whatever. There is a detective, true enough, in both plaintiff's play and in Hatch's story, but detectives, such as appear in each production, are dramatic props that are as old as American play-writing. Maids and cooks, also, are part and parcel of almost every household comedy. As to them, no author has a monopoly. The Flossie Evans of "This Modern Instance" has no counterpart in "My Man, Godfrey." Also the children who, in Miss West's play, contribute to the comical situations it presents, are entirely absent from Hatch's production. Without proceeding further, I am convinced after reading Hatch's story, perusing the tale as it was produced in Liberty and seeing the screen version of "My Man, Godfrey," that the plaintiff has not made out a case of plagiarism against any one of the defendants. Upon the authority, therefore, of Dymow v. Bolton, 2 Cir., 11 F.2d 690, and Harold Lloyd Corp. v. Witwer, 9 Cir., 65 F.2d 1, plaintiff's bill is dismissed with costs.