Donald **BEVAN** and Edmund **Trzcinski**,
Plaintiffs,

v.

**COLUMBIA BROADCASTING SYSTEM,
INC., et al., Defendants.**

No. 67 Civ. 195.

United States District Court,
S. D. New York.

July 30, 1971.

See also, D.C., 293 F.Supp. 1366.

Frances T. Wolff, Schwab & Goldberg, New York City, for plaintiffs.

Coudert Brothers, New York City, for defendants.

## OPINION

TYLER, District Judge.

Pursuant to the Federal Copyright Act, 17 U.S.C. § 101 et seq., plaintiffs seek injunctive and monetary relief from the alleged infringement of their copyrighted play, "Stalag 17", by the TV series "Hogan's Heroes" of which defendants are producers and sponsors. In addition, plaintiffs seek relief under the common law of copyright, reserved by 17 U.S.C. § 2, based upon the alleged infringement of their unpublished "presentation" for a television series, also entitled "Stalag 17" (hereinafter "presentation"), and submitted to defendant Columbia Broadcasting System, Inc. ("CBS"). This latter claim is also styled by plaintiffs as a breach of implied contract. The court has jurisdiction over both claims pursuant to 28 U. S.C. § 1338(a) and (b). See discussion, Nimmer on Copyright (1963), § 131.12, at pp. 572.2–573, particularly n. 52[1] (hereinafter cited as "Nimmer").

Plaintiffs made a timely, albeit unusual, demand for jury trial, to which they were entitled since the complaint sought both legal and equitable relief. Arnstein v. Porter, 154 F.2d 464, 467 (2d Cir.1946); 5 Moore's Federal Practice § 38.26. The eight-day trial, which occurred between April 26 and May 6, 1971 was limited by agreement of counsel to the issue of liability. Approximately 2½ hours after being retired to deliberate, the jury returned a verdict in favor of plaintiffs against all four defendants on both the statutory and common law claims. Defendants' motions,

---

1. It should be noted that defendants never challenged the pendent jurisdiction of this court, pursuant to § 1338(b) to hear the common law claim based upon plaintiffs' presentation. Accordingly, since it appeared from the complaint that the presentation was entirely derivative of the play, my finding, discussed in Part II, infra, that the presentation must be evaluated as a separate work does not deprive it of "relatedness" sufficient to exercise pendent jurisdiction. See, A. H. Emery Co. v. Marcan Products Corp., 389 F.2d 11 (2d Cir. 1968); Maternally Yours v. Your Maternity Shop, 234 F.2d 538 (2d Cir. 1956); Dynamic Instrument Corp. v. Fedtro, Inc., 266 F.Supp. 848 (S.D.N.Y.1967); Rosette v. Crown Record Co., 266 F.Supp. 393 (S.D.N.Y. 1965); 3A Moore's Federal Practice § 18.07 [1.–2].

timely made, for directed verdict and for judgment notwithstanding the verdict, were thereafter briefed and argued to the court on May 21, 1971.

This memorandum will treat three major issues raised by defendants' motions, specifically:

I. The sufficiency of the evidence supporting the jury verdict with respect to the play, Stalag 17.

II. The sufficiency of the evidence supporting the jury verdict with respect to the presentation; and

III. The standing of plaintiffs to maintain this action, in face of an assignment of "motion picture rights" in the play Stalag 17 to Paramount Pictures ("Paramount").

Several of these complex and difficult issues call to mind the now familiar statement of Judge Kaufman, writing for the panel in Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d 304, 305 (2d Cir.1963):

"This action for copyright infringement presents us with a picture all too familiar in copyright litigation; a legal problem vexing in its difficulty, a dearth of squarely applicable precedents, a business setting so common that the dearth of precedents seems inexplicable, and an almost complete absence of guidance from the terms of the Copyright Act. * * *"

Others raise the opposite problem of irreconcilable, *ad hoc* decisions, which are almost inevitable, given the vague contours of copyright protection. Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, at 489 (2d Cir. 1960). Before turning to discussion of these complex and difficult issues, a summary of the evidence adduced at trial is in order.

Confined in a German prisoner of war camp during the second world war, plaintiffs began their collaboration which eventuated in the copyrighted play, Stalag 17, in 1951. The validity of their copyright is not contested. The play completed a widely publicized and acclaimed Broadway run and road tour. By a contract dated September, 1951, Paramount acquired the "motion picture rights" in the play, and produced thereafter the highly successful motion picture, also entitled Stalag 17.

Sometime in 1963, plaintiffs began work on a television series and prepared the presentation (plaintiffs' Exhibit 17) entitled Stalag 17. This presentation, which consists of a thematic outline of the proposed series, description of the characters, six brief narrative sketches and four story ideas was submitted to approximately one hundred firms or their representatives including CBS President James Aubrey at his New York office on July 1, 1964. A considerable time later, plaintiffs received a letter from another CBS official, Mr. White, expressing some interest in the ideas but indicating that CBS had no present or contemplated use therefor. That letter does not indicate whether the presentation was returned to plaintiffs, and no evidence as to its destiny within the CBS establishment was presented.

According to the proof adduced by defendants, the claimed infringing series "Hogan's Heroes" was developed from a pilot teleplay, entitled "The Informer", written by Albert Ruddy and Bernard Fein and submitted to CBS' west coast offices in mid-October, 1964. Having learned through an agent that CBS was interested in the pilot, defendant Bing Crosby Productions, Inc. ("BCP") contracted with the two writers to acquire all right and title to The Informer. Mr. Edward Feldman, an experienced writer, director and producer, was engaged by BCP to develop the series. Feldman brought in Richard Powell, also a well-known writer in the industry. Both men, particularly Powell, made substantial changes in the story line and characters of the pilot. Finally, in late-December, 1964, a revised draft of The Informer, was submitted to CBS and approved.

During this period a series of pre-production conferences concerning the pilot

teleplay had been held on the west coast, at which were present Aubrey, Feldman and Powell, along with other CBS and BCP representatives, and Ruddy and Fein. In 1965, Feldman and Powell began production of the filmed series Hogan's Heroes. Scripts for further episodes were received from various industry writers and rewritten by Powell, who, according to Feldman, was the series' real creator. In September, 1965, The Informer, was broadcast, initiating one of the most successful prime time network series.

At trial, the jury was afforded time to read the actor's edition of the play Stalag 17, as well as plaintiffs' presentation of the same name. In addition, and over defense objection, the jury was shown the later movie, Stalag 17, which contains most of the essential elements of the play plus supplementary material necessitated by the adaptation to the film media.[2] The jury was also shown the film of The Informer, the pilot teleplay of Hogan's Heroes. Although most of the scripts and many of the films of subsequent episodes of Hogan's Heroes were also in evidence, the jury's consideration of the series as a whole was limited to what they could glean from the CBS Production Fact Book, and the comparative testimony, respecting both the play and the presentation, of literary experts, Professor Maurice Valency of Columbia for the plaintiffs, and William Talbot, an editor and publisher, for defendants. Ruddy, Fein and Feldman testified to the origin and development of the television series.

## I.

It has long been the rule that in order to succeed in an action on the theory of copyright infringement, plaintiffs must prove (1) that defendants copied from their works and (2) that such copying worked an unlawful appropriation of at least a substantial, protected part of the allegedly infringed work. Arnstein v. Porter, *supra*,[3] 154 F.2d at 468. Plaintiffs sought to prove copying, as is most frequent, by circumstantial evidence, i.e. by showing that the defendants had access to plaintiffs copyrighted work and that the two works are substantially similar.

■ To establish access, a plaintiff need show no more than that defendant had a reasonable opportunity to view or read plaintiff's work. Blazon, Inc. v. Deluxe Game Corp., 268 F.Supp. 416, 422 (S.D.N.Y.1965); Smith v. Little Brown & Co., 245 F.Supp. 451 (S.D.N.Y.1965), affirmed 360 F.2d 928 (2d Cir. 1966). Here plaintiffs' proof of the extensive popularity of and notoriety surrounding both the original play Stalag 17 and the movie based thereon was sufficient to support the jury's apparent finding that persons involved in the production of Hogan's Heroes had knowledge of the copyrighted work, and the jury was entitled to disbelieve their denials.

■■ It is with respect to the element of substantial similarity that I am constrained to hold the jury's verdict lacking sufficient basis in fact.

Although the question of substantial similarity is predominantly one of fact, it cannot be decided without reference to the scope of protection conferred by the copyright. Copyright law treads a difficult and often tenuous line between encouragement and discouragement of expression. Lord Mansfield stated the

---

2. The jury was instructed to consider the film principally on the issue of access to the plaintiffs' play.

3. In Ideal Toy Corp. v. Fab-Lu Ltd. Inc., 360 F.2d 1021 (2d Cir. 1966), the Arnstein test was treated as the equivalent of the lay observer or audience test, i. e. "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." at 1022. For my own part, I doubt the validity and efficacy of the "audience" or "lay observer" rubric as a test, except perhaps in comparatively simple fields such as fabrics or clothing designs. In the areas of movies, plays, teleplays and written works, this "test" has the weakness of avoiding the serious analysis virtually required under *Arnstein*. See Nimmer, § 143.52.

problem of reconciling two socially useful but antithetical interests in Sayre v. Moore, 102 Eng.Rep. 139, 140 (1785).

"We must take care to guard against two extremes equally prejudicial; the one that men of ability, who have employed their time for the service of the community may not be deprived of their just merits and reward for their ingenuity and labor; the other that the world may not be deprived of improvements nor the progress of the arts be retarded."

To this end, the copyright endows an author with a quasi-monopoly power to exploit his or her work, limited, however, so as not to foreclose others from entering the same field and treating, as here, the same subject matter. Substantial similarity, therefore, is to be judged by comparison not of general ideas but of that which constitutes the author's "expression". This distinction was captured by Judge Learned Hand in his well-known "abstractions test", see Nichols v. Universal Pictures Corp., Inc., 45 F.2d 119 at 121 (2d Cir.1930), and further elaborated in the equally famous "pattern test" of Professor Zechariah Chafee, see Chafee, "Reflections on the Law of Copyright", 45 Col.L.R. 503, 513 (1945). The determination of substantial similarity involves, in the first instance, careful "analysis ('dissection') * * * and the testimony of experts may be received to aid the trier of the facts". Arnstein v. Porter, *supra*, 154 F.2d at 468.

To facilitate analysis and evaluation of the proof on the issue of substantial similarity between the play and series, it is well to set forth in synoptic review plaintiffs' contentions that the two works are similar in that:

1. Both are set in Nazi prisoner of war ("POW") camps, denominated as stalags;

2. The dramatic mood of both works is essentially a carefully balanced blend of the grim and the comic;

3. The principal POW guard "Schultz" appears in both works; and both refer to the threat of sending him to combat duty for the Wehrmacht on the Russian front;

4. Sefton in Stalag 17 and Colonel Hogan in Hogan's Heroes are counterparts;

5. Even comparatively minor characters have counterparts—e.g. Reed in Stalag 17 compares with Newkirk and others in Hogan's; and Harry and Stosh, with Newkirk and Carter;

6. Common themes pervade the two works,—e.g. the discovery of German informers, the virtual "impossibility" of escape from the camp, the baiting, taunting and outwitting of the camp officials, and ultimately the "heroism" of the prisoners, who frequently save one or more of their fellows from the guards or Gestapo, by hiding them, smuggling them out of camp, etc.;

7. Various episodes are common to the two works—roll-call formations, sabotage of German trains, acquisition and concealment of prohibited provisions, etc.

Quantitatively impressive, these apparent similarities break down under the closer, detailed examination which the copyright law requires. Arnstein v. Porter, *supra*. Comparison which focuses, as I believe it should, on the dramatic mood, the details and interplay of the characters, and the dynamic of events indicates such substantial dissimilarity as to render the jury verdict erroneous even under the exacting standard appropriate to a motion for judgment n.o.v. Moore, § 50.07[2] and cases therein cited.

Passing for the moment the similarities incident to the POW camp setting, I find a striking difference in the dramatic mood of the two works. Contrary to plaintiffs' assertions, Hogan's Heroes is virtually empty of the grim, heroic content predominant in Stalag 17. The Hogan's series is unabashed

slapstick; the suspense created revolves around *how* the prisoners will succeed in outwitting the Germans, and not *whether* they will do so and survive, as in the play. Although there are comic interludes in Stalag 17, they serve only to heighten and relieve the grim and desperate themes.

The characters and the dynamic of their interrelationship follow this basic tonal difference. Stalag 17's Sergeant Schultz is a coarse, threatening figure; his joviality is but a thin cloak for his serious activities as guard and informant; his presence is viewed with trepidation by the prisoners. Quite the contrary, the joviality of Hogan's Schultz bears witness to his ineptitude; he witlessly and merrily aids the prisoners while scrupulously refraining from informing his superiors of the extensive intelligence and sabotage activities of Colonel Hogan's band. Nor do plaintiffs' attempts to compare Sefton and Hogan withstand analysis. Beyond the fact that both have the shrewdness and capability characteristic of leadership, the former is a serious, withdrawn, condescending and suspect character; the latter, an amiable, well-loved and trusted clown. The characteristics and function of the informers in the two works are not even superficially comparable. Finally, plaintiffs' comparison of the lesser characters (Reed, Harry and Stosh in Stalag versus Carter and Newkirk in Hogan's) is insubstantial given the different ends their comedy roles serve. In short, the characters and their interplay in Hogan's are, if anything, the inverse of Stalag's. These are not just the minor, deliberate changes of a plagiarist, but flow from and result in an entirely different artistic conceptualization and portrayal of the POW camp situation. Compare Peter Pan Fabrics, Inc. v. Acadia Co., 173 F.Supp. 292 (S.D.N.Y. 1959), affirmed sub. nom. Peter Pan Fabrics, Inc. v. Martin Weiner Corp., *supra*; Nichols v. Universal Pictures Corp., *supra*.

Analogously, the thematic and episodic content of the two works is totally dissimilar. Whereas the entire dramatic denouement of Stalag 17 concerns discovery of the identity of a highly successful informer, the identity and ineptitude of the informer in the pilot of the Hogan's series are apparent from the outset. Whereas in Stalag, it is the prisoners who fear the guards and the Gestapo; in Hogan's, the commandant and the guards act in apprehension of the Gestapo and the "prisoners". Escape, which is indeed a "virtual impossibility" in Stalag, is a daily occurrence in Hogan's, intimately involved with the prisoners' constant intelligence operations. In sum, whereas captivity is a challenge to physical and emotional survival in Stalag, it is an opportunity for comic exploitation and one-ups-manship in Hogan's.

Nor should these very substantial differences in tone, interrelationship of the characters, role of the hero and balance of power be disregarded because reasonably necessary to transform the play Stalag 17 into a television series. See Stonesifer v. Twentieth Century-Fox Film Corp., 48 F.Supp. 196 at 199 (S.D.Cal.1943), aff'd 140 F.2d 579 (9th Cir. 1944); Dam v. Kirke La Shelle Co., 175 F. 902, 907 (2d Cir.1910). Nimmer, § 143.52 at 639–40. On this point, plaintiffs' own submission (as rewritten by Don Fedderson) to ABC and Paramount of a pilot script for a serious dramatic rather than slapstick Stalag series, though not received in evidence for consideration by the jury, is instructive. (Ex. 463 id.)

What resemblance remains between the two works arises from the nature of subject matter, a POW camp within Hitler's Germany. The physical and dramatic accoutrements they share are stock items, characteristic of the POW camp genre of literature. Moreover, the dramatization or "expression" of these public domain components in the works is in almost diametric opposition. See, Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 54 (2d Cir.1936); Davis v. E. I. DuPont de Nemours & Co., 240 F.Supp. 612 at 620 (S.D.N.Y.1965).

Similarity of this kind fails to meet the appropriate legal tests either of substantiality or wrongful appropriation. The Supreme Court stated the principle early in the history of copyright litigation:

> "Copyright is not infringed by an expression of the idea which is substantially similar where such similarity is necessary because the idea or system being described is the same." Baker v. Selden, 101 U.S. 99, 25 L.Ed. 841 (1879).

See Millworth Converting Corp. v. Slifka, 276 F.2d 443, 446 (2d Cir.1960); Bein v. Warner Brothers Pictures, Inc., 105 F.2d 969 (2d Cir.1939); Blazon, Inc. v. Deluxe Game Corp., *supra*; Greenbie v. Noble, 151 F.Supp. 45 (S.D.N.Y.1957); West v. Hatch, 49 F.Supp. 307 (S.D.N.Y.1943); Christie v. Harris, 47 F.Supp. 39, 41 (S.D.N.Y.1942); Underhill v. Belasco, 254 F. 838 (S.D.N.Y. 1918); Nimmer on Copyright § 143.11 at pp. 626–626.1. Compare Stonesifer v. Twentieth Century-Fox Film Corp., *supra*. Although the jury was specifically instructed to disregard those similarities which were virtually necessitated by the use of the same historical setting, clearly in the public domain, the difficulty of sifting out for comparison only the protectible material is particularly great where, as here, non-protectible similarities are so pervasive.

Not only is confusion thus inherent in the subject matter, but, in addition, the testimony of plaintiffs' very competent and straightforward expert, Professor Valency, may have compounded, albeit inadvertently, the jury's difficulties.[4] His direct testimony as to similarities compared Hogan's Heroes with the play and the presentation as a unit. When, on cross-examination, Valency was asked to confine his comparative analysis to the play and the series, he was unable to testify to substantial similarity, beyond that embodied in the ideas or format of the two works—for example, the discovery of an informer in the pilot and the play. Thus, despite his earlier testimony, he concluded:

> "As far as the stage play (Stalag 17) in itself is concerned and Hogan's Heroes, the similarities don't strike me as being so close as to warrant the notion of copying".

Although the conclusions of an expert need not necessarily embody a correct statement of the governing law, here I find, unfortunately for plaintiffs, that Professor Valency's testimony only confirms the lack of such substantial similarity minimally necessary to a finding of infringement. Accordingly, I conclude as a matter of law that the verdict for plaintiffs respecting the claimed infringement of their statutory copyright in the play must be set aside.

## II.

Before turning to a discussion of the merits of defendants' claim that the jury verdict respecting infringement of the presentation was erroneous as a matter of law, it is incumbent upon me to treat defendants' persistent assertion that the complaint failed to give them notice of this claim. In my view, this common-law claim was fairly presaged not only in the pleadings, particularly paragraph 12 of the complaint, but also in discussion during the frequent conferences which preceded this trial.[5]

---

4. Other explanations or more correctly speculations respecting the error of the jury's verdict come to mind. I believe that the jury may have been unduly swayed out of sympathy for the plaintiffs, who are sympathetic indeed, or even for plaintiffs' counsel. Less subjective, perhaps, is the possibility that defendants' rather weak case for independent creation, fraught as it was with missing witnesses such as Powell, and with Fein's admissions that he had borrowed from other works in the creation of the Hogan's series, may have infected the jury's assessment of the plaintiffs' evidence. In view of my conclusion that plaintiffs failed to make out a prima facie case of similarity between the two works themselves, the strength or weakness of defendants' evidence is not at issue. Nimmer, § 139.4 at pp. 605–606.

5. This case was assigned to me as of October 1, 1969 pursuant to the current individual calendar program.

Even assuming that trial counsel [6] first learned of this claim just prior to trial, he had ample opportunity to prepare the defense; indeed, he rejected my suggestion that the trial be continued to permit him to call additional witnesses, such as Powell, the chief scriptwriter of the Hogan's series. Thus, defendants cannot be said to have suffered either surprise or prejudice by virtue of plaintiffs' arguable failure to plead with desirable particularity.

██ Like the motion addressed to the statutory verdict, discussed in Part I, vexing questions of law and fact arise upon the motion to set aside the verdict respecting the unpublished presentation. While the elements of infringement are the same for both claims, the presentation, although also entitled Stalag 17, must be treated as a distinct work. Admitting that decision on this motion is a close one, I cannot conclude that plaintiffs failed to provide the jury with sufficient evidence upon which to find infringement by a preponderance of the evidence.

"Unpublished" manuscripts, which rubric encompasses plaintiffs' presentation,[7] are preserved against exploitation under the common law of copyright, sometimes referred to as the right of first publication. Nimmer, § 46, p. 183. Underlying the common law protection is "the recognition that a property status should attach to the fruits of intellectual labor." Nimmer, § 11.1 at p. 41. The same rationale underlies the protection afforded to submitted ideas on the theory that use of such ideas creates an implied-in-fact contract. Nimmer, § 170, pp. 734–735, citing Cole v. Phillips H. Lord, Inc., 262 App.Div. 116, 28 N.Y.S.2d 404 (1st Dept., 1941). In this case, the two causes of action, both asserted by plaintiffs, track one another. Submission under the contract theory is the analogue of access under the copyright theory; use, the analogue of substantial similarity; the requirement of a confidential relationship, which subsumes the judicially noticeable TV industry practice of remunerating profferrers of accepted though unsolicited manuscripts,[8] the analogue of unpublished status; and the additional requirements of concreteness and novelty, which I deem satisfied here, virtually the analogue of the "expression" requirement. See Nimmer § 173.0–173.2. Given this parallelism, the jury was instructed only upon the copyright claim. The verdict, however, is deemed to support recovery upon either theory.

The dispute concerning the jury verdict respecting the presentation focuses primarily upon the element of access; for convenience, then, the issue of similarity will be treated first. As previously noted, the presentation is a substantially different work. The dominant tone is comic, with intimations of the slapstick found in Hogan's, although some of the grimness of the play carries over; for example, the character Tony, the impressario of the camp theatre, is an amputee. The balance of power, psychological rather than the brutal, physi-

---

6. In fairness, it should be noted that defendants' chief trial counsel entered the case relatively late because of the protracted illness of his partner, who had been present at the pre-trial conferences. As I recall, however, both counsel were accompanied by the same, very competent associate.

7. "Unpublished" is a term of art which includes the communication of the contents of a manuscript "to a definitely selected group and for a limited purpose, without the right of diffusion, reproduction, distribution or sale." Nimmer § 58, at pp. 224–225. See also Werckmeister

v. American Lithographic Co., 134 F. 321 (2d Cir. 1904). The jury was so charged in appropriate language.

8. Nimmer, § 170.2, at pp. 736–737. Text and fn. 103 citing Cole v. Phillips H. Lord, Inc., 262 App.Div. 116, 28 N.Y.S. 2d 404 (1st Dept.1941) and discussing Bailey v. Haberle Congress Brewing Co., 193 Misc. 723, 85 N.Y.S.2d 51 (Mun.Ct. 1948). In the instant case, the letter of Mr. White, which left open the possibility of future use of the presentation, is some direct evidence of this practice.

cal power held by the camp officials in the Stalag play, is clearly on the side of the captives in the presentation. The realities of war and death are defused: in one sketch, the prisoners play psychological war games with model airplanes; in another, they disarm a Dutch soldier not with weapons but with wine. The commandant appears frequently as Hoffy's (Hogan's counterpart) special sparring partner, suggestive of the office strategy sessions between Klink and Hogan in The Informer; and the two Schultz's resemble each other in their ineptitude and complicity with the prisoners. The subject of demasking informers is not specifically treated in the presentation, except insofar as the prisoners seek to protect the assigned interpreter, defined as the Germans' "weakest link."

In addition to these general tonal, role and thematic similarities, plaintiffs contend that there are marked similarities between the presentation story entitled "The Look of Eagles" and the Hogan's episode, "Happiness is a Warm Sergeant", the former concerning a trip to the optometrist, and the latter, to the dentist. In both, there is drinking and an event-filled return to the camp, although the intelligence aspect of the Heroes' mission, perhaps the dominant theme in the Hogan's series, is not presaged in any of the presentation's sketches.

Professor Valency noted the aforementioned general similarities as well as the parallels between these two episodes. He also testified to the recurrence of incidents contained in the plaintiffs' sketches, "The Commandant's Big Night Out" and "Please Don't Feed the Guards", in various unnamed Hogan's scripts. While none of these similarities are so striking as to preclude the possibility of independent creation, they are sufficiently substantial to support the jury verdict.

■ Plaintiffs, therefore, were required to make a plausible showing of defendants' possible knowledge of or access to the presentation itself. Arnstein v. Porter, supra; cf. Heim v. Universal Pictures Co., Inc., 154 F.2d 480 (2d Cir. 1946).

Plaintiffs proved directly and without contradiction the submission of their presentation to CBS New York prior to CBS's receipt of the Ruddy and Fein script. Acknowledgment and virtual rejection of the presentation was communicated to plaintiffs by CBS representative Laurence White. From the fact that the submission was mailed to CBS President Aubrey and that he participated shortly thereafter in preproduction conferences with BCP's and CBS' California officials, plaintiffs urged the court and jury to infer the possibility of knowledge and communication of the presentation's contents. While this judge would not be inclined to accept such a chain of inferences (particularly that Aubrey would have been likely to have read the presentation), I cannot say that the jury was disentitled as a matter of law to do so.

Given the generous definition of access accepted in this Circuit, see Part I, supra, p. 9 plaintiffs' burden of proof is not a very weighty one. Indeed, access is predominantly a question of credibility. Thus, receipt of a manuscript at defendants' principal corporate office has been held sufficient to raise a triable issue, despite plaintiff's inability to show receipt by the responsible employee. Morrissey v. Procter & Gamble Co., 379 F.2d 675 (1st Cir.1967). The issue of the sufficiency of bare corporate receipt has never been likewise isolated for decision in this Circuit or in the New York courts. Rather, corporate receipt has arisen as a matter to be weighed by the fact-finder against defense denials of knowledge, often accompanied by some explanation of the corporate handling of the submission. Pinci v. Twentieth Century-Fox Film Corp., 95 F.Supp. 884 (S.D.N.Y.1951); Allen v. Walt Disney Productions, 41 F.Supp. 134 (S.D.N.Y. 1941); Cantor v. Mankiewicz, 203 N.Y. S.2d 626 (Sup.Ct.1960). Because, in those cited cases, the courts specifically credited the testimony of defense wit-

nesses, noting as well the fortifying effect of great dissimilarity between the works in issue, I believe that *Morrissey* is or would be adopted by this Circuit. The legal rationale can be stated as follows: Once plaintiff establishes a *prima facie* case of access by showing corporate receipt, the burden of going forward with the evidence shifts to defendants, though the burden of proof remains upon plaintiff. A contrary course would saddle a plaintiff with disproving non-access within a corporate structure foreign to him and by witnesses not his own.

I conclude, therefore, that defendants' failure to dispel the inference of access from the facts of the submission to CBS is fatal to their motions for judgment n.o.v. or alternatively for a new trial. Defendants offered no more than bare denials of knowledge by Ruddy, Fein and Feldman, which denials the jury was entitled to disbelieve. Ironically in this case, the jury could have believed them and still found for plaintiffs since the defense produced neither Aubrey, whose possession is most easily inferrable from the proof, nor Powell, nor an employee of CBS, New York, to explain, at the very least, the usual procedures followed with respect to unsolicited submissions. Finally, to the extent that degree of similarity may bear inverse proportion to the necessary proof of access, I note that the similarities are substantial in the respects discussed *supra.*

As noted at the outset, the jury, responding to the court's inquiry, affirmed that its verdict on both claims related to all defendants, including the sponsors of Hogan's Heroes, the General Foods Corporation ("General Foods") and Philip Morris, Incorporated ("Philip Morris"). Since the liability of defendants remains only in respect to the common law copyright or contract claim, it is appropriate to examine here the blanket nature of the verdict, a subject raised by neither side in briefs or argument.

There is sufficient evidence to support the jury verdict of common law infringement and breach of implied contract as to CBS and BCP. CBS was in possession of the presentation and played an active role in the creation and production of the Hogan's series. Knowledge by BCP—apparently the principal creator of the series—of the contents of the presentation, may be inferred from Aubrey's putative possession and involvement with BCP personnel at the pre-production stage. See Nimmer, §§ 148 and 172.

On the other hand, since neither access nor participation was established in respect to the two sponsors, they may not be cast in damages unless they had at least the "power to supervise and control the content of the infringing program." Nimmer, § 134.1 at pp. 583–584; Shapiro, Bernstein & Co. v. H. L. Green Co., *supra,* 316 F.2d at 307; Davis v. E. I. Du Pont de Nemours & Co., *supra.*

Sections 20 and 22 of the Network Television Agreements between General Foods and Philip Morris, respectively,[9] vest sole direction and control over production, performance and broadcasting in CBS. Although there is contained in a later section of those agreements provision for advance submission of the individual teleplays to the sponsors, affording them the right to request alteration prior to filming, I do not consider that this bare contractual provision suffices to hold these defendants liable. First, there was absolutely no evidence offered by plaintiffs that either sponsor had exercised their contractual right in any way arguably relevant to the claim of infringement. Second, the evidence makes it apparent that the Hogan's series was primarily a network-packaged as opposed to sponsor-packaged production. Compare Davis v. E. I. Du Pont

---

9. Plaintiffs introduced into evidence copies of the 1965 and 1966 General Foods–CBS contracts and of the 1965 through 1968 Philip Morris–CBS contracts (Plaintiffs Exhibits 90 and 96, and 91, 92, 95, 98 and 100, respectively).

de Nemours & Co., *supra*. Finally, since the infringement herein concerns an unpublished work, there is no basis for inferring that the sponsors would or should have known of any illegality. *Ibid.* Accordingly, the common law claim against General Foods and Philip Morris must be dismissed as a matter of law.[10] For practical purposes, this dismissal is of little import since CBS contracted to indemnify the two sponsors against liability of this kind.

### III.

Defendants' third ground for setting aside the jury verdict, pleaded as an affirmative defense and raised at the outset of trial, is that the assignment of "all motion picture rights" to Paramount, dated September 25, 1951 (and accompanying contract of the same date) worked a divestment of the very rights herein sued upon by plaintiffs.[11] In support of their position, defendants' counsel submitted a cogent and valuable compendium of authority for overruling the longstanding rule of "indivisibility of copyright", which permits the copyright proprietor to sue for infringement notwithstanding that he or she may have licensed to a third party the very rights sued upon. Plaintiffs were unfortunately cast in the position of loyal adherence to what appears to be an increasingly anachronistic rule, recently eroded by this Circuit in another context. Goodis v. United Artists Television, Inc., 425 F.2d 397 (2d Cir. 1970). While reserving decision on the legal issue pending the jury verdict, the court instructed the parties to offer evidence relevant to their conflicting interpretations of the superficially ambiguous grant in the assignment to Paramount.

Although the legal and factual issues raised by this defense present perhaps the most intricate and interesting questions in this litigation, I deem it neither necessary nor appropriate to resolve them in view of the foregoing rulings upon the substantive claims. Central to this view is the finding, heretofore made, that the presentation is not simply another version of the play Stalag 17, but essentially a different and independent work. Therefore, the presentation—at least the ideas and story lines therein contained upon which the verdict of infringement is founded—is not embraced within even the broadest definition of the bundle of rights which plaintiffs may have conveyed to Paramount. Thus, plaintiffs' standing in respect to the property infringed by defendants is not affected by this affirmative defense.

To recapitulate the foregoing rulings, thus: (1) defendants' motion for judgment, notwithstanding the verdict, dismissing plaintiffs' claim of infringement of their statutory copyright in the play, Stalag 17, is granted, Rule 50(b), F.R. Civ.P.; and (2) defendants' similar motion and their motion for a new trial addressed to plaintiffs' common law claim are denied, except to the extent that this claim should be and is dismissed as against defendants General Foods and Philip Morris. Since, by agreement of the parties, only the issues of liability were tried out, counsel are directed to arrange for a conference with the undersigned to determine procedures for resolution of the outstanding issue of damages. Exhibits should be picked up from chambers without delay.

It is so ordered.

---

10. The fact that the contracts conferred upon the sponsors the right and obligation to advertise the Hogan's series is of no relevance since plaintiffs' claim of unfair competition was dismissed as a matter of law at the close of the evidence.

11. The assignment reserved specifically only future rights to adapt their play for live television. That the Hogan's series is filmed or "canned" is conceded.