UNDERHILL et al. v. BELASCO.

(District Court, S. D. New York. November 25, 1918.)

No. 13–181.

COPYRIGHTS ⬦═65—INFRINGEMENT—DRAMATIC COMPOSITIONS.

A copyrighted play, in large part depicting convent life, *held* not infringed by a play the theme of which is entirely different, although relating to some extent to convent life and with somewhat similar convent scenes.

In Equity. Suit by John G. Underhill and Gregorio Martinez Sierra against David Belasco for infringement of copyright of the play "The Cradle Song" by the production of defendant's play "Marie Odile." Bill dismissed.

### 1. The Cradle Song.

The story is that of a community of Sisters. A baby is sent into the convent on the wheel at the door, by an unknown mother. The receipt of the infant and the decision of the Sisters to keep it form the climax of the first act. In making this decision, it is apparent that the natural love of the female for a child is what is dominating them. The simple inner life of the convent is portrayed.

An interval of 18 years elapses between the first and second act, and the child, who has led a happy, normal life, is now a girl of 18. It is her wedding day, and the Sisters are busily engaged in attending to the final details of her trousseau. It is apparent that she has won their hearts, that she is tenderly loved by them, and that all are keenly interested in her future welfare. When she departs to be married to an estimable young man, all are

---

⬦═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

left sad because of her going away; but it is evident that all recognize her right to be a wife and mother and to live her own life. Her departure at the end of the second act ends the play.

### 2. Marie Odile.

The story is that of Marie Odile, a girl of 16, who has grown up in a convent, in which she is a lay sister. The first act shows that she was left on the doorstep when an infant, and that the Sisters have brought her up. In doing so they have kept her in ignorance of the world in every sense, and she has seen no men, except an aged priest and an old gardener. Marie Odile has heard of the immaculate conception. As a consequence she regards maternity as something holy, but she has no knowledge as to how maternity is achieved. A foreign foe invades the country (France) in which the convent is situated, and the Sisters take flight. Through mistake, Marie Odile is left behind in the company of the old gardener. Marie Odile sees one of the invading soldiers. He is the first young man she has ever seen, and she thinks he is St. Michael, whose portrait hangs in the convent. This ends the first act.

In the second act the soldiers are in possession of the convent, and Marie Odile is attending to their wants. The one whom she regarded as St. Michael is especially kind to her, and they are mutually attracted. She permits him to embrace her.

In the third act, which is a year later, it is revealed that the young soldier went his way and Marie Odile now has a child. She thinks the fact of her having had a child places her on the same plane as the Virgin Mary. The Sisters return to the convent, and when they find what has happened are shocked, and Marie Odile is dismissed from the convent and sent out into the world with her infant.

Paul Bonynge, of New York City, for plaintiff.
A. J. Dittenhoefer, of New York City, for defendant.

MAYER, District Judge (after stating the facts as above). This suit is the usual infringement suit in equity, brought by the plaintiffs, Underhill and Sierra, against the defendant, Belasco. Sierra is evidently a Spanish author of repute, who has written a considerable number of successful productions. Underhill is Sierra's representative in the United States, and is an educated and accomplished Spanish scholar, who translated the work of Sierra which it is claimed defendant has infringed. Defendant is a theater owner, producer, and manager. The difficulty in the case, which doubtless led to the institution of the suit, was the failure of defendant promptly to return to Mr. Underhill the manuscript of "The Cradle Song," which had been delivered to defendant by plaintiff Underhill. This, together with the acceptance shortly thereafter and production of the alleged infringing play "Marie Odile," doubtless created in the mind of Mr. Underhill the feeling that the defendant had availed of the subject-matter of "The Cradle Song," and that the play "Marie Odile" was not an original conception.

As has been frequently pointed out in reported cases, and as is matter of common knowledge, most of the incidents that happen in the world may be availed of in plays or books, and the question essentially is in what manner they are availed of. Except for some extraordinary developments, such as, for instance, have happened in the way of instruments of war in the present war, there is rarely anything that is physically new. Convents are old. The theme of a foundling in some relation or another is old. The conduct of persons

in any given walk or department of life—that is to say, the normal conduct—is ordinarily old and well known. The task which is presented to the playwright is to weld together these old elements with some fundamental or controlling theme in such a manner as to make a successful appeal, either artistically or financially, or both. Except for the fact that the scene of both plays is in a convent, and that of necessity there are some similarities of dialogue and language, the two plays are essentially and fundamentally different.

"The Cradle Song," as stated by Mr. Belasco himself, is a sweet and gentle story, presumably of marked literary merit, disclosing in part the life within a covenant, representing the nuns as being sympathetic and kindly women, dedicated to good works and offices. The foundling in "The Cradle Song" is left at the convent with a note from its unknown mother, and grows up, to all intents and purposes, as a normal female child, and in due course falls in love with the traditional hero, although this particular person is not in any sense a hero from the standpoint of heroics, but just a perfectly sane, normal, male human being. The man Antonio and the girl are to be married, and she leaves the convent with the good will of the Sisters who have brought her up, and with their best wishes. It is perfectly plain that such a play, so far as the American public is concerned, would in all probability not have any strong dramatic appeal, although it might be highly regarded for the purpose it contains. The evidence is that it was a great success in Spain, and, as I understand it, in some other countries, which Mr. Sierra in his deposition has spoken of as Catholic countries. The reason for this, it seems to me, is quite simple. In a country where great numbers of the inhabitants are devout members of a faith, such a play might readily appeal as showing the life within one of the cherished institutions of that faith. In answer to a question, I think asked by the court, Mr. Underhill stated that the play had not been produced in England, nor has it yet been produced in this country, and while I do not pretend to any dramatic knowledge, I assume it is because the play is a simple, normal tale along the lines that I have already indicated.

In respect of "Marie Odile," the play, if not so designed, at least had the result of appealing to the desire of a good many audiences to give themselves the luxury of sorrow. This seems to be a well-known result of which the managers are entirely cognizant. In this play the playwright attempted what at the time of his first conception, and so far as seems to me since, was a bold notion, namely, that a child should be brought up in a convent so thoroughly ignorant of the affairs of the world that, even after a child was born, she would not understand what had happened. In order to produce this situation, it was necessary, as the witnesses have testified, to have a convent entered by man, a condition ordinarily not possible. To bring this about it was necessary that a war should be going on, and that the man entering the convent should be a soldier. Once the fundamental thought of the play is understood, the unexpected feature of the girl imagining that the Prussian soldier was St. Michael is a conception of marked originality from the play-writing standpoint. This play, also, instead

of ending happily and comfortably, ends tragically, when this unfortunate woman is sent out into the world with her child. The whole theory of this play is utterly different from that of the play of Sierra, and in its striking and main points it is completely to be differentiated. It is not enough that both plays are similar in respect of some of the convent scenes. To be an infringement, defendant's play must have been essentially suggestive of the theme of plaintiff's play.

As to the good faith of Mr. Knoblauch, I think there can be no question from the evidence. Mr. Le Guerre testified in effect that the fundamental conception of the play was stated to him by Mr. Knoblauch in the latter part of 1906 or the early part of 1907. He impressed me as a truthful man, who had no reason of any kind for stating other than the truth. But in addition we have in this case the rather extraordinary incident that the memorandum book which Mr. Knoblauch then had has been preserved. It seems to me that I can see perfectly how Knoblauch happened to have this book and keep the book. He was a young playwright, so far as the evidence discloses, having then produced his first play. He had this notion of "Marie Odile" in his mind. He was obviously, according to Le Guerre and according to his own testimony, unfamiliar with the technique of convent life, and he was seeking from Le Guerre at that time as much information as he could possibly obtain in regard to the technique surrounding convent life; and thus it was that this book came to be kept. Miss Mercer substantiates, not at all in detail, but in a general way, the fact that at that time Knoblauch was considering some play of this character, and her testimony is quite useful, because she did not attempt to remember, nor did she remember, all of the details, thus indicating the perfectly natural recollection of a limited character of a truthful witness. There is no doubt that Miss Kauser also had conversations with Knoblauch back in these early days in respect of substantially the basis of the play. That Miss Kauser or Mr. Knoblauch may forget some details or have some dates misplaced is perfectly natural.

The fundamental point is that the conception of the play is in 1906 or 1907, and, as one might expect, such a play was developed over a long period of years, until the time came when the playwright was ready to put his thoughts into concrete form and through his agent dispose of the play commercially. I cannot presume to guess, when there is no evidence on the subject, whether Mr. Knoblauch saw this play in Spain, or did not see it. In any event, it is quite clear to me that the fundamental theme of the play is his own. Mr. Belasco has taken the stand, and subjected himself to examination and cross-examination, and from that examination it appears entirely clear that he did not avail of plaintiff's play; but he was at once impressed with the play of Knoblauch, after he had read the first act. The defendant is an experienced theatrical producer, and from his point of view he saw the dramatic possibilities which were quite well disclosed in the first act to a manager of his experience, and really are well disclosed even to a layman, because the first act indicates the outline of the bold conception of the play, bold in the sense of novel for play purposes,

although, of course, the fundamental thought in a way was undoubtedly obtained from one of the great events in religious history.

However, I feel that the case is quite different from some of the cases that have been in this court. In this case I think plaintiffs have acted in perfect good faith. They were entitled to their contention on the law side of the case, and they were quite justified in supposing that some unfortunate event had occurred by reason of the collocation of dates and the failure promptly to return the play.

Finally, I may say that I have read with care the parallels prepared by plaintiffs and their counsel. As was pointed out in Bachman v. Belasco, 224 Fed. 817, 140 C. C. A. 263, such parallels are very likely to occur. Given life in a convent, there must be in any two productions a certain amount of similar conversation and a certain amount of similar acts. There probably is not a play in the history of the world that has not something that is to be found in some previous publication, either in drama, or in fiction or poetry, or some form of literary endeavor; but infringement cases are never decided upon so narrow a basis. The safest guide is always, to determine what the fundamental theme is, and to see whether it has been appropriated.

In the circumstances, as I think the defendant has not infringed, the bill will be dismissed, but without costs. Settle the decree on two days' notice.