**Ruth MORRIS, Plaintiff,**

v.

**John C. WILSON, Fred Saidy, E. Y. Harburg and National Broadcasting Company, Inc., Defendants.**

United States District Court
S. D. New York.
Dec. 30, 1960.

Ruth Morris, Long Beach, N. Y., pro se.

Herman I. Meltzer, New York City, for defendants; Lee V. Eastman, New York City, of counsel.

WEINFELD, District Judge.

The plaintiff, appearing pro se, charges the defendants with infringement of her copyrighted play, "The Lowells...Talk Only To God," [1] hereafter referred to as "The Lowells." It was registered in the Copyright Office in June 1936. The play has never been published nor commercially performed.[2]

The alleged offending work is a musical play, "Bloomer Girl," which was performed from September 1944 through June 1947, in the United States and Canada and was a box office success. It was based on "Evalina," a play by Dan and Lilith James, written in 1943.

The defendants herein are Fred Saidy, one of the librettists of "Bloomer Girl," who adapted it from "Evalina," E. Y. Harburg, the lyricist of the musical compositions of "Bloomer Girl," John C. Wilson, one of the producers of the musical, and the National Broadcasting Company, Inc., which televised an abbreviated version of it in May 1956. Dan and Lilith James, named as defendants, were not served. However, all in-dividual defendants, whether appearing herein or not, have denied under oath that they knew or ever heard of the plaintiff or her play until the commencement of this suit, almost thirteen years after the original presentation of "Bloomer Girl."[3]

Plaintiff herself does not claim that she ever met any of the defendants or delivered her play to any of them. She does, however, contend that her play was purloined by one of them and that "Evalina," on which "Bloomer Girl" is based, "bears resemblance to my play The Lowells * * *, while the said libretto and lyrics [of "Bloomer Girl"] parody and burlesque, and copy the entire substance of my said drama, * * * that the great bulk of the copying from my said work—scene by scene, sequence by sequence and line by line—was done by said librettists and lyricist."

The plaintiff, since she appears pro se, was permitted to testify in narrative form in support of her charges, and also to meet the defense of laches.

The plaintiff acknowledges that she has no direct evidence of access to her play by any of the defendants. She relies upon what she terms circumstantial evidence, and reasons as follows: In August 1942, after her play had been rejected for production by the Erwin Piscator Theatre Group in New York City, plaintiff left a copy with a young lady on the Group staff, whose name then was, and still is, unknown to her, who stated that she would try to have the play produced at Smith College or some other women's college. Shortly thereafter, in December of that year, a play by Dan James was produced by the same Group. According to plaintiff, playwrights tend to "hang around" studios or theatres while their plays are in rehearsal. From this prem-

1. The play was originally entitled "As We're Able To Spin," and at later times was also known as "Lost Eden" and "Little Women of the Factory."

2. The play was performed by a theatre group in Pasadena, California, in 1939, for which plaintiff received no compensation.

3. The defendant NBC first had word of plaintiff's claim on March 8, 1956, shortly before the presentation of its television program, when plaintiff, following the appearance of a notice in the New York Times, notified NBC of her infringement claim.

ise she infers that James followed custom and was around the studio during rehearsals of his play. She then makes the flat charge that on such an occasion James picked up the copy of "The Lowells," which she had left with the unknown staff member of the workshop. Thus, without foundation of established fact, inference is built upon inference to reach the conclusion of access. The charge of the theft of the copy of her play by the defendant James is most implausible and fails for lack of proof.

Since the plaintiff has failed to establish access by James, or any other defendant, she must, to succeed, make a showing of such striking and extensive similarities between the two plays that the conclusion is compelled that "Bloomer Girl" could not have been written except by copying and plagiarism of her work.[4] Indeed, that is her charge—that "circumstantial proof of access * * * by James, his wife * * * by the librettists * * * and by the lyricist of the said musical * * * is contained in the hundreds of similarities in the libretto and in the lyrics of the said musical to passages, dialogue and action in my said play."

To support her charge, the plaintiff submitted upon the trial a 371-page exhibit entitled "Annotation," wherein is set forth in one column selected portions of her play, in the second parallel column, alleged similarities and identities in "Bloomer Girl" and in the third column, historical references to Mrs. Amelia Bloomer and Bloomerism.[5]

I have studied the Annotation with its alleged pinpointing of copying of plaintiff's play, and have also read the scripts of plaintiff's play and "Bloomer Girl." The plays are wholly dissimilar in plot, theme, incident, language and characters. The dissimilarity is so marked that there is no real basis for comparison.[6] A great many of the alleged similarities or identities which plaintiff purports to find and which are paralleled in the Annotation are strained, forced or nonexistent.[7]

"The Lowells," as described by the plaintiff, is a serious historical drama of a sociological nature. It is a story of New England factory labor, as well as the beginnings of the feminist movement. The time is 1848. The play revolves about a group of girls working long hours in a textile mill in Lowell, Massachusetts, for low wages and under unsafe and unsanitary conditions. The young women operatives are recruited mainly from fairly prosperous and well-mannered farm families. All live in a company-owned boarding house.

Apart from their work, the girls are interested in religious, cultural and educational pursuits. After a period of service at the factory, they plan to return to their rural homes, comparatively affluent, educated and fashionably clad. Although the factory is operated under substandard conditions, the mill owners profess a paternalistic attitude toward them.

A principal character is a young, crusading newspaper publisher, Dexter Robinson, who initiates a campaign to end

---

4. See Christie v. Cohan, 2 Cir., 154 F.2d 827 (per curiam), certiorari denied, 1946, 329 U.S. 734, 67 S.Ct. 97, 91 L.Ed. 634; Arnstein v. Porter, 2 Cir., 1946, 154 F. 2d 464, 468; Frankel v. Irwin, D.C.S.D. N.Y.1918, 34 F.2d 142.

5. Amelia Bloomer is an historical figure, who, in the second half of the 19th century, was a leader in the women's suffrage and temperance movements. Contrary to popular public opinion, she did not originate the pantalette or bloomer, as it subsequently became known. In an effort to publicize her activities, and as a

symbol in the fight for the political independence of women, she wore the pantalette, which was in sharp contrast to the confining type of attire worn by women at that time. Presumably, it was supposed to reflect a break with hidebound tradition.

6. Cf. Kustoff v. Chaplin, 9 Cir., 1941, 120 F.2d 551, 561.

7. Cf. Christie v. Harris, D.C.S.D.N.Y. 1942, 47 F.Supp. 39, affirmed sub nom. per curiam, Christie v. Cohan, 2 Cir., 154 F.2d 827, certiorari denied, 1946, 329 U.S. 734, 67 S.Ct. 97, 91 L.Ed. 634.

their exploitation and becomes embroiled in a struggle with the mill owners. Robinson, aided by a local doctor, seeks to eliminate the unsafe and unsanitary conditions at the factory, the overcrowded condition at the boarding house, and to force an increase in wages and a reduction of the long hours of work. Generally, the girls are not responsive to his efforts to improve their lot because they do not consider themselves laborers; they regard themselves separate and apart from other employees, mainly drawn from foreign elements. However, when the management announces a reduction in the wages and an increase in the rent, Robinson encourages the girls to participate in a "flare-up" or demonstration in protest at which he and others are to address them. One of the speakers inadvertently offends the girls by classifying them as ordinary laborers, and suggesting that as mill operatives they are worse off than the southern slaves. The girls resent these analogies and other references to substandard conditions of employment in the mill system. In consequence, the demonstration fails and the girls march off and return to the factory and accept the owner's judgment on the necessity for the pay cut and the room rent increase. Shortly thereafter, most of them face lay-offs due to an economic depression. Unperturbed and, in fact, rather pleased by the prospect of enforced vacations, they all resign and are replaced by immigrant labor.

Meanwhile, Robinson has fallen in love with one of the mill operatives, who is the heroine of the drama, and, after surmounting barriers, the couple determines to marry and to reside in the mill town, there to fight on behalf of the foreign born workers, who, to. the mill owners' surprise, have already begun to protest against conditions of employment.

"Bloomer Girl" is a musical comedy which contains song numbers, dancing, ballet, drama and pageantry. It centers about a feminist uprising in 1861 in Cicero Falls, an eastern manufacturing town. The leader of the movement is Dolly Bloomer, an advocate of women's suffrage and the abolition of slavery. Dolly's brother-in-law, Horatio Applegate, a domineering person, is the leading hoop skirt manufacturer in town. He is determined that Dolly's newspaper, which publicized her reform ideas, and. the closing of which he instigated, shall remain closed. However, she continues. to publish it clandestinely.

Evalina, his only unmarried daughter,. is in rebellion against her father, and joins her aunt in the reform movement.. As a symbol of their crusade, Dolly, Evalina and others wear pantalettes or bloomers in protest against women's. slavish adherence to hoop skirts which,. of course, is contrary to the interests. of Evalina's father, the hoop skirt manufacturer.

Evalina's father is determined to have her marry Jefferson Calhoun, the brother of his best customer. Evalina and Dolly hide a runaway slave who, it soon develops, is Jeff's servant. Meanwhile, Jeff falls in love with Evalina. Complications, not uncommon in such situations,. develop. Seeming differences in their attitudes toward slavery temporarily drive the lovers apart. The girls, led by Dolly Bloomer, parade before a crowd which includes Applegate's customers, in support of the abolition of slavery, and to Applegate's dismay, arouse the ire of a number of his southern buyers,. including Jeff's brother.

Eventually the slave is freed, the couple married, the newspaper reopened and the hoop skirt factory is commandeered for the manufacture of pantalettes for Zouave soldiers, and Dolly is placed in charge by her former suitor, the governor of the state, who also proposes. marriage.

One struggles in vain to find meaningful similarities between the two works.

The overriding theme in "The Lowells" centers about the evils of a segment of the early textile mill system in New England, the crusade to eliminate them in the face of the owners' opposition and the indifference of the operatives. In the author's own words, the play "depicts

savage industrial strife, and is packed with conflict and with drama." The feminist movement theme is subordinate. Indeed, the historical Mrs. Bloomer never appears on stage in "The Lowells," and is referred to quite casually as a prospective speaker at a lecture "on dress reform, as well as reform in general." [8]

On the other hand, "Bloomer Girl" is a musical comedy, which uses the feminist and abolition movements as a vehicle to provide entertainment by way of songs, dance numbers, ballet and an Uncle Tom's Cabin show. Mrs. Bloomer, the historical crusader in the feminist movement, is fictionally portrayed therein by Dolly Bloomer, a leading character, who, together with her followers, throughout the play, affect the bloomer. Women's rights is a dominant theme.

As to the slavery issue, only passing reference is made to it in "The Lowells," whereas in "Bloomer Girl," it is again dominant.

Any claimed similarity between the plays, plots and sequences ends with the general historical themes of the feminist and abolition movements.[9]

Plaintiff, in her trial memorandum, admits that "the plot of Bloomer Girl does not adhere closely to the plot of The Lowells, which is serious and sociological," but charges that "[it] largely follows the action in one scene in my play, the flare-up scene * * *." But the plaintiff's claim lacks support in fact. The only similarity between the two scenes is that in each, women, in organized form, protest against claimed grievances—a means of protest used as far back as 400 B.C. in "Lysistrata" by Aristophanes, and repeated in countless plays through the centuries. The purposes of the parades and protest meetings are different, one being economically motivated, and the other being inspired by political goals. The marches, as well as the accompanying events, are executed in entirely different manners.

Likewise, plaintiff's attempted equation of characters is without substance. She concedes that no single character in her play is paralleled by a like character in "Bloomer Girl," but claims that the James', being sophisticated playwrights, combined traits of two, three or more of her characters into a composite character in their play and employed "evasive variation and coloration in order to veil the plagiarism"—that it was only with great effort that she could detect the analogies.

For example, plaintiff perceives Dolly Bloomer as "a catch-all character, copied from my fictional characters Mrs. Amelia Bloomer and Dexter Robinson, [and] * * * from two other characters in my play." The alleged identification between Robinson and Dolly Bloomer is premised in part upon the fact that each is an editor of a crusading newspaper, that the former fights for the elimination of the evils of the factory system, and the latter fights for the emancipation of women and the abolition of slavery, and each incurs the hostility of powerful factory owners. Crusaders, pamphleteers and evangelists are as old as history. The alleged identity of Dolly Bloomer to the other characters likewise fades upon analysis.

Emphasis is given to her charge of unlawful appropriation, she asserts, by the circumstance that one of her characters is also named Dolly. Thus she flatly states, "Dolly Bloomer got her first name from my Dolly Buttrick." Parallel significance is detected by her in an instance where Dolly of "The Lowells" states that she enjoys gazing from her window to

---

8. Plaintiff's Exhibit 1, which is the copy of the play filed with the Court, contains this reference. Plaintiff's Exhibit 1a, offered upon the trial, states only that Mrs. Bloomer will speak on "dress reform."

9. These, of course, are in the public domain. See Funkhouser v. Loew's, Inc.,

8 Cir., 1953, 208 F.2d 185, 189–190, certiorari denied, 1954, 348 U.S. 843, 75 S.Ct. 64, 99 L.Ed. 664; Greenbie v. Noble, D.C.S.D.N.Y.1957, 151 F.Supp. 45, 65. The James', in their depositions, listed the historical source material which they used in the writing of "Evalina." In fact, plaintiff concedes that the defendants did independent research.

see what goes on in the street, and an entirely different situation in "Bloomer Girl," where Dolly has occasion to leap through a window to get to the street. To say the least, this and similar attempts to find identities of characters in the two plays is farfetched.

Isolated phrases and even single words of everyday usage in defendants' play are seized out of context by plaintiff and urged as evidence of copying, but, as stated in a well known and frequently cited authority—

> "[I]nasmuch as the plaintiff cannot claim a copyright on [the] words in the dictionary, or on usual English idioms, or on ideas, the alleged paraphrasing comes to naught * * *." [10]

Indeed, it is significant that nowhere in the extended Annotation is there a single instance of a copying of a sentence or a paragraph, despite the fact that such is one of her charges.

Finally, great stress is placed upon alleged similarities in environmental factors. Thus, plaintiff points out that her play takes place in Lowell, Massachusetts, a New England industrial town, and the "Bloomer Girl" in an eastern industrial town; that demonstrations or flare-ups occur on the town green in each and that the rather proper boarding house in "The Lowells" is parodied by the former bordello in "Bloomer Girl." The extremes which mark plaintiff's attack are evident from one item, typical of many others, which she contends gives substance to her charges. In her play she describes a bedroom in the company-owned boarding house which has colored woodcuts of "The Cotter's Saturday Night," Raphael's "Madonna" and "The Last Supper," and then charges as a similarity that "nude pictures play an important part in the wall decor" of the former bordello in which The Lily, the newspaper, is published by Dolly Bloomer.

Purported similarities of a like nature, in support of her charges of access and appropriation, are set forth ad infinitum in the Annotation, but no purpose would be served by a discussion of each. Suffice to say they do not sustain the charges.[11]

The plaintiff has subjected "Bloomer Girl" to a microscopic dissection, but even this labored effort has failed to justify her extravagant charges. The two plays just bear no resemblance—at least not to this average reader.[12] They are so unlike that it is difficult to understand how she could persuade herself that the one was borrowed from the other.[13]

Particularly appropriate to the instant case is a statement by our Court of Appeals in an earlier case:

> "In order to suppose that these * * * authors should have found in the plaintiff's play cues for the farfetched similarities which she discovers, one must be obsessed, as apparently unsuccessful playwrights are commonly obsessed, with the inalterable conviction that no situation, no character, no detail of construction in their own plays can find even a remote analogue except as the result of piracy. 'Trifles light as air are to the jealous confirmations strong as proof of holy writ.'" [14]

The Court concludes that upon all the evidence the plaintiff has failed to sustain her burden of proof and that the

10. Lewys v. O'Neill, D.C.S.D.N.Y.1931, 49 F.2d 603, 611–612.

11. Cf. Lewys v. O'Neill, D.C.S.D.N.Y.1931, 49 F.2d 603, 611; Frankel v. Irwin, D.C. S.D.N.Y.1918, 34 F.2d 142; Underhill v. Belasco, D.C.S.D.N.Y.1918, 254 F. 838.

12. See Kustoff v. Chaplin, 9 Cir., 1941, 120 F.2d 551, 559; Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119, 123, certiorari denied, 1931, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795.

13. Cf. Hubges v. Belasco, C.C.S.D.N.Y. 1904, 130 F. 388.

14. Christie v. Cohan, 2 Cir., 154 F.2d 827–828 (per curiam), certiorari denied, 1946, 329 U.S. 734, 67 S.Ct. 97, 91 L.Ed. 634.

defendant is entitled to judgment of dismissal upon the merits.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

Submit decree in accordance with the foregoing.