**LEEDS MUSIC LIMITED et al.,**
**Plaintiffs,**

**v.**

**Pierre ROBIN et al., Defendants.**

**The ROBERT STIGWOOD GROUP LIM-ITED et al., Plaintiffs,**

**v.**

**REPERTORY COMPANY OF AMERICA, INC. et al., Defendants.**

**Civ. Nos. 72–474, 71–304.**

United States District Court,
S. D. Ohio, E. D.

May 3, 1973.

---

Earl F. Morris, Wright, Harlor, Morris & Arnold, Columbus, Ohio, Robert C. Osterberg, Abeles, Clark & Osterberg, New York City, Stephen A. Kroft, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for plaintiffs.

Stuart A. Benis, Benis & McGinley, Columbus, Ohio, for defendants.

## OPINION AND ORDER

CARL B. RUBIN, District Judge.

These actions [1] in copyright infringement and for permanent injunctive relief are before the Court on the parties' cross motions for summary judgment. At issue are the questions of whether defendant Robin and his Repertory Company of America are in the process of or plan to infringe the copyrights of plaintiffs Leeds Music Limited and The Robert Stigwood Group Limited, in the dramatico-musical work entitled *Jesus Christ Superstar*. The Court must further determine whether this work, whose lyrics were written by Timothy Rice and whose music was composed by Andrew Lloyd Webber, was in turn pirated from *The Passover Plot* by Dr. Hugh J.

---

1. Because these two cases raise similar questions of fact and law, and involve the same parties in interest, we consolidated them by Order dated December 27, 1972. See Rule 42(a), Fed.R.Civ.P.

Schonfield.[2] If this latter question is answered in the affirmative, the Court must then consider what effect such piracy should have on the validity of the copyrights here involved.

To assist us in making these legal determinations, both sides have submitted extensive briefs, affidavits, exhibits and analyses of these respective works. In addition, the Court has heard testimony from defendnat Robin; has carefully listened to the authorized recording of *Jesus Christ Superstar* and read *The Passover Plot* with some care; and has been generally briefed by its own teenage children on the place of rock opera in the counter-culture. We have also scrutinized the certificates of registration of copyright in *Jesus Christ Superstar* which have been submitted to the Court.[3]

■ It is, of course, well established that these certificates of copyright registration are *prima facie* evidence of the validity of the copyrights and of the right to enforce all rights and interests therein. See 17 U.S.C. § 209; also see Blumcraft of Pittsburgh v. Newman Brothers, Inc., 373 F.2d 905 (C.A.6 1967); Flick-Reedy Corp. v. Hydro-Line Manufacturing, 351 F.2d 546 (C.A.7 1965), cert. den. 383 U.S. 958, 86 S.Ct. 1222, 1223, 16 L.Ed.2d 301 (1965); Remick Music Corporation v. Interstate Hotel Co. of Nebraska, 58 F.Supp. 523 (D.Neb.1944), aff'd. 157 F.2d 744 (C.A.

8 1946), cert. den. 329 U.S. 809, 67 S.Ct. 622, 91 L.Ed. 691 (1946); Jerry Vogel Music Co. v. Forster Music Publisher, Inc., 147 F.2d 614 (C.A.2 1945).

Nor is there any question that these copyrights, if valid, are properly within the possession and for the protection of the plaintiffs herein. Rice and Webber, who originally claimed rights in the rock opera, *Jesus Christ*, assigned these rights, except as to a segment entitled "King Herod's Song," to plaintiff Leeds Music Limited. This plaintiff then separately registered these claims to copyright in the opera as a dramatico-musical work and as to several of its individual segments. See 17 U.S.C. §§ 1(d), (e), 5(d); also see Robert Stigwood Group Limited v. Sperber, 457 F.2d 50, 51–52 (C.A.2 1972); Robert Stigwood Group Limited v. O'Reilly, 346 F.Supp. 376, 378–380 (D.Conn.1972). Plaintiff Leeds Music Corporation subsequently acquired by assignment the rights of Leeds Music Limited in *Jesus Christ Superstar* for its United States productions. Plaintiff Universal City Studios, Inc., then acquired the exclusive worldwide motion picture rights in the work. See Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968); Sheldon v. Metro-Goldwyn Pictures Corp., 81 F. 2d 49 (C.A.2 1936), cert. den. 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936).

The issue of defendants' alleged intent to infringe plaintiffs' copyrights was

---

2. Schonfield, *The Passover Plot* Bantam Books, N. Y. (1967). All further page references to this work will refer to this edition.

3. The certificates of copyright registration submitted with the present record have been identified as follows:

(1) "SUPERSTAR (From the Rock Opera 'Jesus Christ')" December 5, 1969, Class E, No. Eu 151211;

(2) "JOHN NINETEEN FORTY-ONE (From the Rock Opera 'Jesus Christ')" December 5, 1969, Class E, No. Eu 151212;

(3) "I DON'T KNOW HOW TO LOVE HIM (From the Rock Opera 'Jesus Christ')" October 30, 1970, Class E, No. Eu 219295;

(4) "JESUS CHRIST SUPERSTAR, A ROCK OPERA (Musical Excerpts Complete Libretto)" December 21, 1970, Class D, No. Dp 7618;

(5) "JESUS CHRIST SUPERSTAR, A ROCK OPERA (Libretto)" February 24, 1971, Class D, No. Df 2066 (Additional Words);

(6) "JESUS CHRIST SUPERSTAR, (Vocal Score)" April 20, 1971, Class D, No. Du 79703.

Subsequent references in this opinion to the music and lyrics of *Jesus Christ Superstar* will relate to Copyright #4 above, as filed and paginated with the Copyright Office of the Library of Congress, Washington, D. C.

first presented to the Court in late December, 1972. At that time the plaintiffs moved, pursuant to Rule 65, Fed. R.Civ.P., for a preliminary injunction. After hearing testimony in open court, we granted, by Order dated December 29, 1972, plaintiffs' motion for preliminary injunctive relief, thereby restraining defendant Robin and his agents from proceeding with threatened plans to make a movie version of *Jesus Christ Superstar*, in complete disregard of plaintiffs' similar plans, sizeable capital investment, and presumptively valid copyrights.

The Court, at that time, specifically found that Robin had such infringing plans and intended to act on them unless restrained from doing so by court order. See Leeds Music Limited v. Pierre Robin, Civil No. 71–474, Finding of Fact No. 6, at 3 (S.D.Ohio E.D.1972) (slip opinion). There has been no change in the publicly stated position of defendant Robin since the date of our last order. We have no doubt that if the earlier restrictions were lifted, the defendants would proceed to attempt to carry out their plans of filming *Jesus Christ Superstar*. Their position has been consistently that plaintiffs' copyrights are invalid for aforementioned reason of alleged literary piracy.

As this affirmative defense raises only questions of law and as there are no genuine fact issues before the Court, disposition of this matter on motions for summary judgment is appropriate. See Rule 56, Fed.R.Civ.P.; also see Lewis v. Magna American Corp., 472 F.2d 560 (C.A.6 1972); Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972). While it is true that summary judgment should only be granted through the exercise of "great restraint," see Wahl v. Vibranetics, Inc., 474 F.2d 971 at 976 (C.A.6 1973); also see Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7

L.Ed.2d 458 (1962); C. F. W. Construction Co. v. Travelers Insurance Co., 363 F.2d 557 (C.A.6 1966); it is equally true that summary judgment is proper where, as here, "a trial would serve no useful purpose." Wahl v. Vibranetics, *id.*, 474 F.2d at 976, also see Applegate v. Top Associates, Inc., 425 F.2d 92 (C.A.2 1970); Rogers v. Peabody Coal Co., 342 F.2d 749 (C.A.6 1965).

We must now turn to the central question presented in these actions and determine whether *Jesus Christ Superstar* was, in fact, pirated from *The Passover Plot*. Sadly, in view of the great expenditures of time and effort by the parties herein, the answer to this query flows inexorably from its statement. It is true that these two works have some superficial similarities. Obviously, both works deal with the character of Jesus, his historical setting and religious experiences; both works do this in a nontraditional, revisionist-contemporary manner. However, nearly everything else about them is dissimilar.

Dr. Schonfield's *The Passover Plot* is a somewhat scholarly if sensational work dealing with Jesus' life and times. It is set in the form of a conventional book and contains no musical score; it can be read profitably and enjoyed without the services of a musical accompanist. Dr. Schonfield presents in his book the not altogether novel thesis that Jesus has a historical, as well as a religious dimension, and that any serious attempt to understand Jesus the man must, of necessity, involve an understanding of the political and social milieu of which he was a part.[4]

Schonfield's original contribution is to specifically argue that Jesus was something of a political machiavel who consciously plotted to fulfill the political prophecies of the Old Testament, and especially those of *Jeremiah, Ezekiel* and *Daniel,* having to do with the coming of a messianic King (or Son of God). See

4. See, for example, Albert Schweitzer, *The Quest of the Historical Jesus: A Critical Study of its Progress from Reimarces to* *Wrede* (Macmillan, N.Y.1959) (first published in German in 1906).

Schonfield, *id.*, at 11–39. A crucial part of the alleged plot involved an effort to simulate death on the cross through a drug induced trance, and a later "resurrection" which the plotters hoped would set off a political insurrection by Jewish zealots against the Roman overlords.[5] The plot failed, not because of any character defects in Jesus, but because of the clumsy sadism of one of the faceless Roman spear-carrying soldiers on Golgotha.

The *Jesus Christ Superstar* of Messrs. Rice and Webber, to the contrary, is in the recently evolved art form known as "rock opera." Hear and compare The Who, *Tommy* (1971); also hear *Hair* (1969); *Godspell* (1972). Even after making allowance for artistic license and a liberal interpretation of the Aristotelian unities, this Court concludes that *Superstar* is a more temporally limited work than is *The Passover Plot*. While the *Plot* considers the whole of Jesus' life as its subject, *Superstar* depicts only his last seven days in Jerusalem which culminate in his crucifixion. The message of *Superstar*, as with all truly operatic works, is rendered exclusively through song and music and spectacle. It is all music and libretto and contains no "book" in Broadway on Schonfieldian terms. The Jesus of *Superstar*[6] is a charismatic, rock and roll singer who, through indecision and curiosity, and on a kind of ego-trip, goes to his confused death on the cross. His great popularity among his followers has partially convinced the Superstar that he is divine. This is particularly distressing to one of his most dedicated followers, Judas, who, while he loves Jesus the man, dislikes, distrusts and ultimately betrays him as a "Superstar."

In many ways, Judas is the most carefully delineated character in the play and perhaps the true protagonist of *Superstar*. Judas, unlike Jesus, is portrayed as one deeply committed to the cause of the poor and the meek. This was, of course, the characteristic stance of the early church as recorded in the New Testament. See *Acts* iii, 44–45. The sybaritic and egocentric attitudes of Jesus, which Judas interprets as a betrayal of the movement, lead, in *Jesus Christ Superstar*, to his misguided treachery.[7]

This is not to suggest that there is not, in a very general fashion, some similarities between the conception of Jesus in *The Passover Plot* and *Superstar*. In both instances Jesus is portrayed in a way that could conceivably scandalize those persons who prefer to conceptualize him in more conventional religious

5. A truly scholarly account of Jesus' possible connections with the zealot political faction of the First Century is more persuasively presented in Professor S. G. F. Brandon's *Jesus and the Zealots: A Study of the Political Factor in Primitive Christianity* (Scribner, N.Y.1967).

6. The term, "superstar," is not precisely defined in the standard dictionaries we have consulted. It is a term that has come into popular use in the past decade and usually refers to a performer who, in addition to possessing great talent, is an individual with more than his fair share of "charisma." In this sense, Joe Namath of the New York Jets is a superstar, while the typical quarterback (or cab driver for that matter) is not.

7. This contrast between the two positions is made in the beautiful and popular song, "Everything's Alright," where Judas, irate at seeing Jesus' female followers preparing rubbing myrrh and ointment, angrily sings:

JUDAS
    Woman your fine ointment—brand new and expensive
    Could have been saved for the poor
    Why has it been wasted? We could have raised maybe
    Three hundred silver pieces or more
    People who are hungry, people who are starving
    Matter more than your feet and hair
to which a resigned and self-centered Superstar replies:
JESUS
    Surely you're not saying we have the resources
    To save the poor from their lot?
    There will be poor always, pathetically struggling—
    Look at the good things you've got!
    Think! while you still have me
    Move! while you still see me
    You'll be lost and you'll be so sorry when I'm gone
        *Jesus Christ Superstar* at 13–16

terms. Therefore both the view of Jesus as a political figure (as in *Plot*) or in parable as a modern folk hero (as in *Superstar*) more resemble each other than either resembles the views that have long prevailed in the seminary and pulpit.

On the other hand, both of the works at bar fall within a not insignificant body of contemporary culture which has sought to humanize or politicize the historical Jesus. Belonging to this category are such famous works as Pier Paulo Pasolini's film, *The Gospel According to St. Matthew* (1965), which depicts an angry and slightly Marxist Jesus; Brandon's book, *Jesus and the Zealots, supra,* at n. 6, which shows a Jesus who is deeply involved in the factional party politics of Judea in the time of the early Roman Empire; and *Godspell,* which is a rock musical for the stage based upon Jesus' life as recorded in *Matthew*.[8] All of these works, and many others of the same genre, attempt to reinterpret the historic Christian message and the highly complex character of Jesus in a manner which can be reconciled with the problems of the modern world.

Nor does it necessarily follow that this revisionist manner of viewing the life of Jesus springs only from a soured, contemporary state of mind or imagination. The biblical texts themselves, when read with a different mind or political view, can produce these same effects. As Pasolini demonstrates in his fine film, *The Gospel According to St. Matthew, supra,* Jesus' words and parables, in the context of First Century Judaea, are not necessarily reassuring and gentle. When delivered by a gaunt and angry young rabbi, photographed on grainy black and white film against a dry, desert background which simulates the conditions of his native Galilee, Jesus' words have a sharp and upsetting quality to them. And yet the script of this movie is derived exclusively from the St. James version of *Matthew,* one of the synoptic Gospels.

We therefore do not agree with the defendants' assumption that there is a single, "correct," view of the life of Jesus. However, from this premise, which we believe to be an erroneous one, the defendants have argued that evidence of piracy can be inferred because of similarities in the depiction of certain key characters in both *Plot* and *Superstar.* As we have indicated above, such parallelisms, if they do in fact exist, may as likely have been caused by the use of the same source material, i. e., The Bible, or by general intellectual ferment and currents, i. e., God-is-Dead and Jesus-Freak movements and the works cited above, as by conscious literary plagiarism. Because defendants' analysis in support of their position is too long and elaborate for full consideration, we will discuss it only as it representatively pertains to the character of Pilate.

■ The defendants' reactions to the assignment of the song, "Pilate's Dream,"[9] to Pilate is clear from the outset. They are outraged that this song, which they describe (and in which description the Court concurs) as "one of the loveliest in the play," and as one possessing a "sweet and moving melody," (in which description the Court

8. Also see S. G. F. Brandon, *The Trial of Jesus of Nazareth* (Stein & Day, N.Y. 1968); D. H. Lawrence, *The Man who Died* (Random House, N.Y.1927).

9. The lyrics of this song, in their entirety, are as follows:
PILATE
   I dreamed I met a Galilean
   A most amazing man
   He had that look you very rarely find
   The haunting hunted kind
   I asked him to say what had happened
   How it all began
   I asked again—he never said a word
   As if he hadn't heard
   And next the room was full of wild and angry men
   They seemed to hate this man—they fell on him and then
   They disappeared again
   Then I saw thousands of millions
   Crying for this man
   And then I hear them mentioning my name
   And leaving me the blame
   *Jesus Christ Superstar* at 26–28

once again concurs) should be sung by Pilate who is described as "a cold and ruthless despot." See Defendants' Memorandum in Support of Motion for Summary Judgment, March 9, 1973, Section C at 1. The defendants are incredulous that Pilate, who was charged by the Emperor Tiberius with ". . . intemperate brutality, avarice [and] greed while in office . . ." is portrayed in *Superstar* as a man of "sensitivity and compassion." The defendants then ask, rhetorically, why Pilate, whose ". . . contempt for Jesus and his 'truth' . . . has not gone unreported," should be allowed a prescient and melodious dream.[10] Defendants' Memorandum, *id.*, Sect. C at 1. The defendants then proceed to answer their own queries. Following more than twenty (20) pages of highly personalized and subjective analysis (which the Court can barely fathom, much less concur with)[11] the defendants finally conclude that the

10. In support of this piracy theory, the defendants even note that the Bible ascribes the dream, and a plea for mercy on behalf of Jesus, not to Pilate but rather to Pilate's wife. See *Matthew* xxvii. 19. We fail to see how this aids their piracy theory as Schonfield's account of this incident is consistent with Matthew's and therefore contradictory to *Superstar*. See *Passover Plot, supra,* at 121–122. Even if this were not so, the Court can understand allowing some leeway for this detail out of deference to dramatic license, especially where, as in the script of *Superstar*, there is no provision for a wife to Pilate.

11. The defendants contend that "Pilate's Dream," which is set out in n. 9, *supra*, is in part pirated from the following passage from *The Passover Plot*:

"The only way in which we can *hope* to *know* the real *Jesus* is by first *becoming conscious* of him as a man of his *own time, country* and *people*, which necessitates an *intimate acquaintance* with all three. We have resolutely to refuse to detach him from his setting, and let the influences which played upon him play upon us. We have to mark the *traits* in him which were personal, individual, whether pleasing or unpleasing, which convey to us the attributes and idiosyncracies of a creature of *flesh and blood*. Only when this *Galilean Jew* has made an impact upon us in the cruder aspects of his mortality are we entitled to begin to cultivate him and estimate his worth, allowing him to communicate to us the *imaginations* of his mind and the motivation of his actions. If, then, we perceive in him some spark of genius, some quality of greatness and nobility of soul, we shall not incline to exaggerate or convert him impossibly into a paragon of all the virtues. Such a man could have his *godlike moments*, but could never be consistently a reflection of the Divine except for those whose notions of deity would permit the gods to share our human frailties."
*The Passover Plot, supra,* at 3–4 (emphasis as it appears in Defendants' Memorandum)

After elaborating at some length, how these two seemingly disparate fragments are at all related, the defendants summarize their similarities as follows:

SUMMARY OF FIRST STANZA
SIMILARITIES, LITERAL AND OTHER IN VERSE AND BOOK

| PILATE'S DREAM | THE PASSOVER PLOT |
|---|---|
| 1. I dreamed | 1. WE CAN HOPE |
| 2. I met | 2. TO KNOW |
| 3. a Galilean | 3. THIS GALILEAN JEW |
| 4. A most amazing man | 4. A MOST EXCEPTIONAL MAN |
| 5. A most amazing man | 5. THIS AMAZING MAN |
| 6. He had that look you very rarely find | 6. THE CRUDER ASPECTS OF MORTALITY |
| 7. The haunting | 7. GODLIKE MOMENTS |
| 8. The haunting | 8. IN THE DIFFERENT STAGES OF HIS MANIFESTATION AS THE MESSIAH |
| 9. hunted kind | 9. CREATURE OF FLESH AND BLOOD |
| 10. hunted king | 10. HIS ANCESTOR DAVID HUNTED BY THE KING |

Defendants' Memorandum, *id.*, Sect. C at 5A. Also see, for phrases in column 2, not contained in the Schonfield quote above, *The Passover Plot, supra,* at 3, 86, 174.

inspiration for allowing Pilate to deliver this particular song was pirated from the *Plot*.[11A]

It may well be that Pilate is viewed traditionally both by history and by large segments of the contemporary Christian community, as a "cold and ruthless despot." [12] But even a cursory reading of the New Testament indicates that this view is not necessitated by the actual Gospel texts. If anything, it could be argued that the depiction of Pilate in *Jesus Christ Superstar* does not differ markedly in content—while differing greatly in form—from the picture of the man that may be obtained in the Gospels, and especially those of *Luke* and *John*.

Luke's Pilate is determined to save Jesus, whom he considered innocent, from the passions of the mob. See *Luke*, xxiii. 1–25. After making an initial determination of "no fault," *id.*, 4, Pilate, upon discovering that Jesus was a Galilean, referred him to Herod Antipas, tetrarch of Galilee, who had subject matter jurisdiction over his countrymen. *Id.*, 5–7 [13] But Herod referred him back to Pilate, because the charge pending against Jesus was a capital one and therefore not punishable under local law. *Id.*, 8–11.[14] For a second and third time

---

**11A.** It is, of course, well established that a claim of piracy cannot be based upon the use of common words and phrases, ripped untimely from their original contexts. See Holmes v. Hurst, 174 U.S. 82, 86, 19 S.Ct. 606, 43 L.Ed. 904 (1898); Bachman v. Belasco, 224 F. 817, 818 (C.A. 2 1915); also see Morris v. Wilson, 189 F.Supp. 565, 570 (S.D.N.Y.1960), aff'd. 295 F.2d 36 (C.A. 2 1961), cert. den. 368 U.S. 1004, 82 S.Ct. 639, 7 L.Ed.2d 543 (1962); O'Brien v. Chappel & Co., 159 F.Supp. 58, 59 (S.D.N.Y.1958); Columbia Pictures Corp. v. National Broadcasting Co., 137 F.Supp. 348, 358–359 (S.D. Cal.1955). Nor can piracy be inferred by subjective reactions to various passages. Such a defense to copyright is maintainable only where the literary resemblance is apparent to the average reader. See Christie v. Cohan, 154 F.2d 827, 828 (C.A. 2 1946), cert. den. 329 U.S. 734, 67 S.Ct. 97, 91 L.Ed. 634 (1946); Kustoff v. Chaplin, 120 F.2d 551, 559 (C.A. 9 1941); Morris v. Wilson, *supra*, 189 F.Supp. at 576.

**12.** However, this view is by no means a unanimous one. Consider, for example, the character of Pilate as conceived by Anatole France in his ironic short story, "The Procurator of Judaea," in *Golden Tales of Anatole France* (Dodd, Mead & Company, N.Y.1926). In this story Pilate is portrayed as an Agricola-type Roman who tried to carry out his official responsibilities properly but who was obstructed at every turn by a corrupt bureaucracy and a stubborn, superstitious subject people. He is deeply concerned that history will misjudge him—but primarily because of his failure to quickly suppress a Samaritan revolt and of his failure to complete an adequate system for Jerusalem—for he has no independent recollection at all of the crucifixion of Jesus!

**13.** Compare this with the Pilate in *Superstar* who, upon discovering Jesus' citizenship, declares:

  PILATE

    An amazing thing—this silent king
    Since you come from Galilee then you need not come to me
    You're Herod's race! You're Herod's case!

*Jesus Christ Superstar*, *supra* at 50. This reference of Jesus to Herod appears only in Luke. See *The Passover Plot*, *supra*, at 122, 144–145.

**14.** "[S]ince the genius of Rome has towered over them [the Judaeans] capital sentences pronounced by their own tribunals can only be carried out with the sanction of the proconsul or procurator, they harry the Roman magistrate at any hour to procure his signature to their baleful decrees, they besiege the pretorium with their cries of 'Death!'" Pontius Pilate in *The Procurator of Judaea*, *supra* n. 12 at 20.

Or, as this point is rendered in *Superstar*:

  PILATE

    And so the King is once again my guest
    And why is this? Was Herod unimpressed?

  CAIAPHAS

    We turn to Rome to sentence Nazareth
    We have no law to put a man to death
    We need him crucified—it's all you have to do
    We need him crucified—it's all you have to do

*Jesus Christ Superstar*, *supra*, at 59.

Pilate could find "no fault" in Jesus and recommended that he merely be chastised (flogged) and released. *Id.*, 13–17, 22.[15] These proposals of mercy by Pilate only brought forth " . . . loud voices, requiring that he [Jesus] might be crucified. And the voices of them prevailed. And Pilate gave sentence that it should be as they required." Luke xxiii. 23–24.

John's Pilate is even more convinced of Jesus' innocence than is Luke's. After a relatively long philosophical discussion, which delved into such things as the relativity of truth and the source of Jesus' powers, compare John xviii. 37–38, xix. 10–11 with *Jesus Christ Superstar, supra* at 59–60, this Pilate grew "afraid" and "sought to release" Jesus. See *John xix.* 8, 12. But the people, upon seeing Pilate's attitude nearly accused him of being a traitor and " . . . cried out saying: "If thou let this man go, thou art not Caesar's friend: whosoever maketh himself a King speaketh against Caesar." John

xix. 12.[16] The crowd's attitude prevailed and Jesus was crucified. *Id.*, 16–19.

While the four gospels are not entirely consistent as to what occurred on that Passover Friday, and in what sequence these events transpired, in none of them is the description of Pilate as a "cold and ruthless despot" justified by reference solely to the New Testament itself.[17] To the extent this characterization of him exists among the general public or in the mind of the defendants, it is based upon cultural attitudes extraneous to the biblical record.[18]

█ From what we have said above, it should be obvious that, in our view, by allowing the Pilate of their play to sing the "sweet and lovely melody," "Pilate's Dream," the plaintiffs have created no inconsistency with the biblical record. Furthermore, the scripting of the song for Pilate raises absolutely no inference of literary piracy from *The Passover Plot.* Our representative analysis as to the role of Pilate applies with equal force to the remaining alleged

---

15. Compare this with:
PILATE
   I see no reason—I find no evil
   This man is harmless so why does he upset you?
   He's just misguided—thinks he's important
   But to keep you vultures happy I shall flog him
*Jesus Christ superstar, supra,* at 59.

16. Compare this with:
MOB
   Pilate! Crucify him!
   Remember Caesar—you have a duty
   To keep the peace so crucify him!
   Remember Caesar—you'll be demoted, you'll be deported
   Crucify him!
*Jesus Christ Superstar, supra,* at 60.
Also see *The Passover Plot, supra* at 146 where Schonfield writes:
   "Pilate cared nothing about Jesus. He did care about his own position if he should be accused to Tiberius of fomenting disaffection by executing a Jew on unsupported testimony. At Rome they did not take kindly these days to provocative action in the Provinces, and the governor was already in trouble enough because of the disturbances resulting from his flouting of Jewish customs.

What decided him finally to give way was the threat of an even more sinister accusation: 'If you free the man you are no friend of Caesar's. Whoever claims to be a king is in opposition to Caesar.'"

17. Even in *Mark,* the oldest of the synoptic gospels, and the one in which he fares least well, Pilate is shown as recognizing the envy the priests feel for Jesus, as offering the crowd to choose between Jesus and Barabbas; and as inquiring, when they insisted on Jesus: "Why, what evil hath he done." See *Mark* xv. 1–11, 14. And Matthew has Pilate declare to the mob, while washing his hands of responsibility that: "I am innocent of the blood of this just person: see ye to it." *Matthew* xxvii. 2–23, 24.

18. This Court has recently noted analogous misconceptions in cultural attitudes pertaining to pregnant school teachers. See Heath v. Westerville Board of Education, 345 F.Supp. 501, 505 n. 1 (S.D.Ohio E.D.1972) cited with approval in LaFleur v. Cleveland Board of Education, 465 F.2d 1184 (C.A. 6 1972). Certiorari has been granted by the Supreme Court in *LaFleur.* See 411 U.S. 947, 93 S.Ct. 1921, 36 L. Ed.2d 408 (April 24, 1973).

similarities of character and general setting between *Jesus Christ Superstar* and *The Passover Plot*. We therefore conclude that the ideas embodied in *Jesus Christ Superstar* are derived from an independent source in the public domain, namely the Bible. Consequently, the defendants' contention that the underlying conception of *Superstar* was pirated from *The Passover Plot* is lacking in merit and must be rejected.

But even were we to assume, *arguendo*, that the copyrighted play at bar was pirated from Schonfield's book, the foregoing analysis and the affidavits of Rice and Webber (to the effect that they had not read *The Passover Plot* prior to their creating *Superstar*) notwithstanding, we would still remain of the view that the defendants are not entitled to any relief.

Both *The Passover Plot* and *Jesus Christ Superstar* offer contemporary interpretations of a person and event whose centrality to our civilization is hardly to be doubted. The birth, life, mission, crucifixion and resurrection of Jesus have provided, over the centuries, the inspiration for some of the greatest works of imagination, philosophy and religion that the Western mind has produced. It is almost inconceivable to think of how impoverished our pictorial, choral, and architectural collections would become were those towering works, which owe their spiritual genesis to the figure of Jesus, to be suddenly removed. And yet the defendants urge upon this Court an unprecedented theory of copyright law—one which would give several copyright holders almost exclusive control of ideas that are the common property of mankind—and would have us invalidate the copyright of *Jesus Christ Superstar* because of its alleged derivation from *The Passover Plot*.

■ Luckily, this theory expresses a profound misunderstanding of the law of copyright. For unlike the business of building better mousetraps (where the continuing possibilities of achieving dramatic technological breakthroughs may still exist) it might well be said that there are no truly new ideas under the sun. For this reason, it is fundamental to copyright law that statutory protection is given . . . only to the expression of the idea—not the idea itself." Mazer v. Stein, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954). For this reason ". . . a copyright does not monopolize the intellectual conception, but [rather] the form of expression and arrangement of words adopted by the copyright proprietor . . . [I]t is not the subject that is protected by copyright. It is the treatment of a subject that is protected." Nutt v. National Institute, Inc., 31 F.2d 236, 238–239 (C.A.2 1929); also see Scott v. W. K. J. G., Inc., 376 F.2d 467 (C.A.7 1967), cert. den. 389 U.S. 832, 88 S.Ct. 101, 19 L.Ed.2d 91 (1967); First Financial Marketing Services Group v. Field Promotions, Inc., 286 F.Supp. 295 (S.D.N.Y.1968); Magnus Organ Corp. v. Magnus, 269 F.Supp. 981 (D.N.J. 1967); Elekes v. Bradford Novelty Co., 183 F.Supp. 730 (D.Mass.1960). If the law were otherwise, mankind's precious few core ideas could be removed from the marketplace of thought, cauterized from the constant restatement, refinement and reinterpretation which is the very hallmark of an imaginatively and intellectually alive culture.

■ Unlike patent, which the defendants appear to confuse it with, copyright protection is available to a work that, while not novel in conception or idealogical content, is original. See Sheldon v. Metro-Goldwyn Pictures Corporation, 81 F.2d 49, 53–54 (C.A.2 1936), cert. den. 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936); Silvers v. Russell, 113 F.Supp. 119 (S.D.Cal.1953). Even this requirement of originality has been liberally construed by the courts. Our circuit court, for example, has very recently noted that ". . . any 'distinguishable variation' resulting from an author's independent creative endeavor will constitute sufficient originality." M. M. Business Forms Corp. v. Uarco, Inc., 472 F.2d 1137, 1139 (C.A.6 1973); also see

Roth Greeting Cards v. United Card Co., 429 F.2d 1106 (C.A.9 1970); Donald v. Zack Meyer's T. V. Sales and Service, 426 F.2d 1027 (C.A.5 1970); Alexander v. Irving Trust Co., 132 F. Supp. 364 (S.D.N.Y.1955), aff'd. 228 F. 2d 221 (C.A.2 1955), cert. den. 350 U.S. 996, 76 S.Ct. 545, 100 L.Ed. 860 (1956); Funkhouser v. Loew's, Inc., 208 F.2d 185 (C.A.8 1953), cert. den. 348 U.S. 843, 75 S.Ct. 64, 99 L.Ed. 664 (1954), rehearing den. 348 U.S. 890, 75 S.Ct. 209, 99 L.Ed. 700 (1954); Trebonik v. Grossman Music Corp., 305 F.Supp. 339, 346 (N.D. Ohio E.D.1969); Covington Fabrics Corp. v. Artel Products, Inc., 328 F. Supp. 202 (S.D.N.Y.1971). The degree of originality required by the law to obtain a copyright ". . . has been held to be . . . 'little more than a prohibition of actual copying.'" M. M. Business Forms Corp. v. Uarco, Inc., supra, 472 F.2d at 1139, citing Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99, 103 (C.A.2 1951).[19] It has further been established that ". . . similarities of incidents alone will not constitute an infringement . . . especially when both works are based on common sources and concern events in the life of an historic figure." Greenbie v. Noble, 151 F.Supp. 45, 69 (S.D.N.Y.1957); also see Funkhouser v. Loew's, Inc., supra, 208 F.2d at 188; Tralins v. Kaiser Aluminum Corp., 160 F.Supp. 511 (D.Md. 1958); Lake v. C. B. S., 140 F.Supp. 707 (S.D.Cal.1956).

In applying these tests to the case at bar, we find ourselves in complete agreement with the holding of Robert Stigwood Group Limited v. O'Reilly, 346 F. Supp. 376, 383, and adopt it herewith as our holding:

> The plaintiffs do not possess copyrights to the Biblical narration, characters, or sequence of events of the last seven days of Christ. They do, however, have rights to their original musical expression of those last days of Christ . . . It is clear that

the plaintiffs' lyrics are original, highly creative, and even controversial, expressions of the Biblical passages. As such, they are within the protection of the Copyright Act.

■ We further hold that to the extent the title, *Jesus Christ Superstar*, has developed a secondary significance in the public's mind in connection with the opera as a whole, the defendants ". . . must be enjoined from directly or indirectly advertising or in any way representing any presentation as being from *Jesus Christ Superstar* or from making or attempting to make a motion picture or television production of the same." See Robert Stigwood Group Limited v. Sperber, 457 F.2d 50, 56 (C.A.2 1972); also see Robert Stigwood Group Limited v. Hurwitz, 462 F. 2d 910 (C.A.2 1972); Rice v. American Program Bureau, 446 F.2d 685 (C.A.2 1971); also see M. Nimmer, Copyright, § 34 (1971).

Defendant Robin may well be an extraordinarily talented director who is capable of bringing to the surface of *Jesus Christ Superstar* nuances just barely discerned by the show's actual creators. But our duty as a court must be to ". . . prevent exploitation of the opera in a manner that infringes the rights of the creators of the work and their assignees." Robert Stigwood Group Limited v. Sperber, supra, 457 F. 2d at 51. In view of the special circumstances here presented, however, the statutory policy expressed in 17 U.S.C. § 116 will be vindicated by keeping the award of mandatory costs at a low level; and by exercising our discretion to deny the award of an attorney's fee. See Alexander v. Irving Trust Co., supra; also see, Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc., 329 F.2d 194 (C.A.2 1964); Chappell & Co. v. Middletown Farmers Market, 334 F.2d 303 (C.A.3 1964); Blumcraft of Pittsburgh v. Newman Bros., Inc., 337 F.Supp. 859 (S.D. Ohio W.D.1971).

---

19. Also see the Court's decision in M. M. Business Forms, reported at 347 F.Supp. 419, 424–425 (S.D.Ohio E.D.1972).

Accordingly, it follows that a final judgment of permanent injunction must issue to prevent the defendants from further threatening the integrity of the plaintiffs' copyright interests in *Jesus Christ Superstar*.

It is so Ordered.